# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| **BOARDWALK APARTMENTS, L.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-2714-JAR-KMH** |
| | ) | |
| **STATE AUTO PROPERTY AND** | ) | |
| **CASUALTY INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

This is an insurance coverage action arising out of a 2005 fire at Boardwalk Apartments,
L.C.'s ("Boardwalk") apartment complex in Lawrence, Kansas. Boardwalk was insured under a
commercial property insurance policy issued by State Auto Property and Casualty Insurance
Company ("State Auto"). The Policy's business income, replacement cost, and coinsurance
provisions are at issue in this case. Before the Court are motions for partial summary judgment
filed by each party (Docs. 211, 214). On the business income coverage claim, State Auto moves
for partial summary judgment; Boardwalk moves for full summary judgment. On the
replacement cost claim, State Auto moves for summary judgment on the basis of certain
affirmative defenses; Boardwalk moves for partial summary judgment. State Auto further moves
for summary judgment on Boardwalk's alternative claims of misrepresentation and negligent
claims handling. Boardwalk moves for summary judgment on State Auto's affirmative defenses
and counterclaims. For the reasons explained in detail below, the Court grants in part and

denies in part both motions.[1]

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

---

[1]The Court denies the parties' request for oral argument on the summary judgment motions because it would not materially assist the Court in deciding these motions.

[2]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[3]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7]*Spaulding v. United Trasp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[14]

Defendant has the burden of proof on the affirmative defenses, and thus in moving for summary judgment on the affirmative defense, "[t]he defendant . . . must demonstrate that no

---

[8]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[9]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(c)(4).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

disputed material fact exists regarding the affirmative defense asserted."[15] Once the defendant

makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of

a disputed material fact."[16] If the plaintiff cannot meet this burden, "the affirmative defense bars

[the] claim, and the defendant is then entitled to summary judgment as a matter of law."[17]

"Where, as here, the parties file cross motions for summary judgment, [the Court is]

entitled to assume that no evidence needs to be considered other than that filed by the parties, but

summary judgment is nevertheless inappropriate if disputes remain as to material facts."[18] Cross

motions should be considered separately.[19] Just because the Court denies one does not require

that it grant the other.[20]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it

is an important procedure "designed to secure the just, speedy and inexpensive determination of

every action."[21] In responding to a motion for summary judgment, "a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

mere hope that something will turn up at trial."[22]

---

[15]*Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir.1997).

[16] *Id.*

[17]*Id.*

[18]*James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[19]*Ultra Clean Holdings, Inc. v. TFG-Cal., L.P.*, 534 F. App'x 776, 780 (10th Cir. 2013) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

[20]*Id.*

[21]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[22]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

## II.     Facts

### A.     Evidentiary Objections

Fed. R. Civ. P. 56(c)(2) provides that "a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Boardwalk raises two evidentiary objections to several exhibits submitted by State Auto in support of its motion for summary judgment and in opposition to Boardwalk's motion for summary judgment. First, Boardwalk objects that the exhibits were not properly authenticated. State Auto attached modified exhibits to its reply memorandum for all of these exhibits except Exhibit II, adding authenticating evidence. Therefore, the authentication objections to Exhibits G, L, M, N, Z, GG, KK, LL, MM, NN, and OO are moot.

Exhibit II is a fax transmittal of Boardwalk's June 15, 2010 Building Permit Application to the City of Lawrence, by the architect of the apartment building, Paul Werner. State Auto submits this evidence in support of its factual contention that Boardwalk did not apply for a building permit until this time. There is no requirement that each piece of evidence submitted on summary judgment be accompanied by an authenticating affidavit.[23] Instead, this Court is to determine whether there is "evidence sufficient to support a finding that the item is what the proponent claims it is."[24]

For purposes of summary judgment, the Court sustains this objection. This document appears to have been produced by Boardwalk during discovery, however the parties dispute when the operative building permit was filed with the City of Lawrence. Boardwalk submits

---

[23]*Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1170-71 (10th Cir. 2009).

[24]Fed. R. Evid. 901(a).

similar documents showing the application was filed in February 2010, which were authenticated by Paul Werner, who signed the documents and on whose letterhead the documents were faxed to the City.  Boardwalk also submitted an affidavit of Suzanne Rieger, who attests that she delivered the application in February.  The record before the Court is insufficient to determine whether this June 2010 application was in fact filed with the City, and if so, if it was the operative application for purposes of determining when Boardwalk initiated the process of municipal approval.

Boardwalk argues in the alternative that most of the same exhibits also constitute inadmissible hearsay.  Again, these objections are cured by the modified exhibits filed with State Auto's reply memorandum.  They are admissible because they are not offered for the truth of the matter asserted, or because they fall under the hearsay exceptions as business records or statements of a party opponent.

### B.    Uncontroverted Facts

The following material facts are either uncontroverted or stipulated to.[25]

### *The Policy*

State Auto issued a commercial property insurance policy No. PBP-2-080-575 (the "Policy") to Boardwalk for the period of February 12, 2005 to February 12, 2006.[26]  The Policy was written to insure the Boardwalk Apartments Complex located in Lawrence, Kansas,

---

[25]The Court does not consider facts presented by the parties that the record does not support or that are not relevant to the legal issues presented.  Nor does the Court consider legal arguments included in the parties' statements of fact.

[26]There is no dispute about the language of the Policy and the Court will not reproduce all relevant provisions in this Order.  Instead, the Court discusses many of these provisions in conjunction with the legal arguments presented by the parties in interpreting the terms of the Policy.

consisting of eight apartment buildings and one building used as a storage area (the "complex").

The complex was built in 1963. At all times material to this litigation, Ernest Fleischer was the

managing member of Boardwalk and the person primarily responsible for Boardwalk's business

dealings. The Policy provided for blanket building and replacement cost coverage for the

complex to the policy limit of $7,207,200, plus a four percent inflation guard, subject to a $5000

deductible and a 100% coinsurance provision.

The Policy includes a "building and personal property coverage form" that insures

Boardwalk for "direct physical loss of Covered Property." The Policy also provided for limited

coverage of $10,000 for costs incurred to comply with laws and ordinances as part of the

"Additional Coverages" section. The Policy' replacement cost coverage provides as follows:

> E. Loss Conditions
> . . . .
>> 4. Loss Payment
>>> a. In the event of loss or damage covered by this
>>> Coverage Form, at
>>> our option, we will either:
>>>> (1) Pay the value of lost or damaged
>>>> property;
>>>> (2) Pay the cost of repairing or replacing the
>>>> lost or damaged property, subject to b.
>>>> below;
>>>> (3) Take all or any part of the property at an agreed or
>>>> appraised value; or
>>>> (4) Repair, rebuild or replace the property with other
>>>> property of like kind and quality, subject to b. below.
>> . . . .
> G. Optional Coverages
>> . . . .
>> 3. Replacement Cost
>>> a. Replacement Cost (without deduction for
>>> depreciation) replaces Actual Cash Value in Loss
>>> Condition, Valuation, of this Coverage
>>> Form.
>> . . . .

c. You may make a claim for loss or damage covered by this insurance on an actual cash basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs and replacement are made as soon as reasonably possible after the loss or damage.

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2), or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property. If a building is rebuilt at a new premises, the cost described in e.(2) above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.[27]

The Policy also provides for "BLANKET BUSINESS INCOME RENTAL PROP INCL EXTRA EXPENSE" coverage up to the policy limit of $1,099,200, subject to a 100% coinsurance provision. That portion of the Policy includes the following provision:

---

[27]*Id.* at 27–28.

A. Coverage
   1. Business Income
   Business Income means the:
      a. Net Income (Net Profit or Loss before income
      taxes) that would have been earned or incurred; and
      b. Continuing normal operating expenses incurred,
      including payroll.
   . . . .
   Coverage is provided as described and limited below for
   one or more of the following options for which a Limit of
   Insurance is shown in the Declarations:
      a. Business Income including "Rental Value".
      b. Business Income other than "Rental Value".
      c. "Rental Value".
   If option a. above is selected, the term Business Income
   will include "Rental Value". If option c. above is selected,
   the term Business Income will mean "Rental Value" only.
   . . . .

   We will pay for the actual loss of Business Income you
   sustain due to the necessary "suspension" of your
   "operations" during the "period of restoration". The
   "suspension" must be caused by direct physical loss of or
   damage to property at premises which are described in the
   Declarations and for which a Business Income Limit of
   Insurance is shown in the Declarations. The loss or
   damage must be caused by or result from a Covered Cause
   of
   Loss . . . .

The Policy defines the terms "Period of Restoration," "Rental Value," "Suspension," and

"operations."

### *The Fire and State Auto's Payments to Boardwalk*

On October 7, 2005, a building in the Boardwalk complex, "Building 1," was destroyed

by fire. Another building in the complex, "Building 4," was also minimally damaged by fire. At

the time of the fire, Building 1 was comprised of 78 units; all 78 units were destroyed.[28]

_____

[28]These units included 76 apartments and two units leased to a commercial laundry company which
provided laundry equipment for tenant use.

Boardwalk notified State Auto of the fire on October 8, 2005.

The fire is a "Covered Cause of Loss" and Building 1 is "Covered Property" under the Policy. As of the date of the fire, the Policy Limit, after adjusting for the 4% inflation factor, was $7,394,389.74.

State Auto hired an independent adjuster in Kansas City, Missouri, Patrick Bello, to adjust Boardwalk's property loss and rental business income loss claims. Bello advised State Auto in January 2006 that he estimated the cost to replace Building 1 was between $3.9 million and $4.0 million.

State Auto treated Boardwalk's business income claim as falling under the "Business Income including 'Rental Value'" provision of the Policy. By letter dated February 1, 2006, Mr. Bello reported to State Auto that "[t]he insured and I have reached an agreement regarding the claim for Business Income," subject to State Auto's "final decision with respect to coverage and the amount paid."[29] In his February 1, 2006 letter, Mr. Bello reported to State Auto that Mr. Bello and Boardwalk agreed that "[t]he monthly Business Income claim is $18,296.24," subject to "adjustment" for reduced real estate taxes.[30]

On February 3, 2006, Bello emailed to State Auto a revised business income calculation, indicating a monthly loss of $18,296.24 for three months and a "Monthly loss less real estate tax" of $16,799.24 thereafter.[31] Bello sent State Auto a letter dated February 10, 2006, stating that the business income figures were again revised. He stated that the duration for the monthly

---

[29]Doc. 215-1, Ex. 1.C.

[30]*Id.*

[31]*Id.*, Ex. 1.D.

figure which includes the real estate tax had been adjusted to eight months, and that seven months was calculated at the rate without the real estate tax, for a total duration of fifteen months. Bello advised State Auto that "[t]he insured is in agreement with the allowance for the real estate tax. However, the duration at the lower rate is still open for discussion. They have not arrived at a final duration that they are ready to settle on."[32]

In emails sent on February 9 and 10, 2006, State Auto advised Boardwalk's insurance agent that State Auto believed, based on its counsel's advice, that the Kansas Valued Policy Statute "limits our exposure to building #1 for this loss to the stated value of the building plus the inflation factor."[33] State Auto explained that the "stated value," taken from a rating sheet, plus a 4% inflation factor was $2,240,724.17. State Auto agreed to pay $2,128,794.17, the difference between the stated value with inflation and the demolition costs previously paid. On February 10, 2006, State Auto paid Boardwalk $2,128,794.17 as indemnity for Building 1. On February 28, 2006, Boardwalk signed a State Auto form titled "Advance Payment/Non-Waiver Agreement (Property Claim)."

The $2,128,194.17 that Boardwalk received from State Auto as indemnity for Building 1 was not immediately used to rebuild Building 1, but was instead invested by Boardwalk to generate a return. On March 2, 2006, Boardwalk transferred $900,353.55 of the indemnity payment to a line of credit in the name of the Barbara Jean Fleischer Irrevocable Trust. On January 17, 2007, Boardwalk loaned $1,006,721 from the line of credit to Park Place Apartments, L.C. ("Park Place"). The members of Boardwalk and Park Place are the same.

---

[32]*Id.*, Ex. 1.E.

[33]Doc. 215-16 at 9, Ex. 16.A.

On March 2, 2006, $1,228,174.86 of the indemnity payment was used to purchase commercial paper on Boardwalk's behalf. The interest earned on this investment was transferred to Boardwalk's line of credit and to its managing member's account to pay for business expenses. On September 1, 2006, Boardwalk loaned $180,000 to Creative Candles, LLC, at an interest rate of 9.0%, principal and interest to be paid monthly until August 2016. Interest income that Boardwalk earned from its investment of the nearly $2.1 million it received from State Auto was available to pay Boardwalk's expenses.

In computing net income in 2004 and 2005, Boardwalk included interest income reported on Schedule K, line 5 of its federal income tax return. "Interest income," however, is reported on a separate line item than "net rental real estate income (loss)," resulting in two types of income.

On Schedule K, line 5 of its 2007 return, Boardwalk reported $26 in interest income. Boardwalk did not report all of the accrued $15,464.12 in interest income on the Creative Candles loan that year.

On Schedule K, line 5 of its 2008 return, Boardwalk reported $168,257 in interest income. Boardwalk recorded this as accrued interest for tax reporting purposes. It is based on applying an 8% interest rate to the $2.1 million State Auto payment. Boardwalk did not report that it accrued $14,367.57 in interest income on the Creative Candles loan that year.

On Schedule K, line 5 of its 2009 return, Boardwalk reported $168,000 in interest income. Boardwalk did not report all of the $14,187.81 in accrued interest income on the Creative Candles loan that year.

On Schedule K, line 5 of its 2010 return, Boardwalk reported $194,917 in interest

income.  It itemized the interest income as $183,179 from "accrued interest on note," $37 from "Commerce Bank," and $11,701 from "Creative Candles."  Boardwalk in fact accrued $14,187.81 in interest income on the Creative Candles loan that year.

On Schedule K, line 5 of its 2011 return, Boardwalk reported $86,435 in interest income. It itemized the interest income as $76,202 from "Park Place Apartments," $1 from "Commerce Bank," and $10,232 from "Creative Candles."

The estimate to repair minor fire damage to Building 4 was $1101.86.  State Auto issued a check to Boardwalk in the amount of $583.99 for the damage to Building 4 from the fire.  State Auto invoked the coinsurance provision on the replacement cost claim for Building 4, so it determined that Boardwalk was entitled to recover 53% of the repair estimate.

On February 10, 2006, State Auto advised Boardwalk's agent that the business income claim was still being adjusted and was ongoing.  In March 2006, Bello sent an email to State Auto stating that Boardwalk's insurance agent had asked what duration of time State Auto would use in calculating the business income claim.  Bello advised State Farm that he told the agent that State Farm would make a decision.  Bello told the insurance agent by email on March 21 that he did not see evidence that State Auto had requested proof of loss from Boardwalk under the business income coverage provision of the policy, but that he would send a copy to State Auto to determine if this was incorrect.  Between November 2, 2005 and February 10, 2006, State Auto paid Boardwalk a total of $150,000 toward Boardwalk's business income losses. Between February 10, 2006 and the date of this litigation on December 30, 2011, State Auto communicated in writing to Boardwalk with respect to its position on the business income claim only through its litigation filings.  State Auto did not otherwise state in writing that it disagreed

with Bello's income loss figures, nor did it explain why it ceased making rental business income payments to Boardwalk, the duration of time State Auto believed should apply to Boardwalk's Business Income Coverage Form, and what additional information it needed to finalize the business income claim.

In 2007, Boardwalk retained Kenneth Jaggers of Integra Realty Services to provide an estimate to replace the Boardwalk complex. He initially estimated the total replacement cost to be $13,291,356, which he later amended downward to $10,401,527. Bello, the independent adjuster retained by State Auto, estimated the replacement cost for the complex to be $13,841,620.

The City of Lawrence adopted a new Land Development Code effective July 1, 2006. The City of Lawrence adopted the 2006 International Building Code effective January 1, 2008.

### *The Missouri Litigation*

On March 27, 2006, State Auto filed a declaratory judgment action against Boardwalk in the U.S. District Court for the Western District of Missouri (the "Missouri Litigation"), asking for a declaration that it had paid all amounts owed under its Policy under the Kansas Valued Policy Statute, K.S.A. 40-905(a), or in the alternative, that the coinsurance provision applied. State Auto contended that it paid $2,128,194.17 to Boardwalk, on condition of reservation of rights, during the course of the claim investigation and that it is entitled to a setoff and/or credit in the amount of this advance payment against any future sum paid to Boardwalk under the Policy. After initiating the Missouri Litigation, State Auto made no further payment to Boardwalk on its business income or property loss claims.

Boardwalk filed an Answer and Counterclaim, arguing that if the Kansas Valued Policy

Statute applied, it was entitled to the entire "Blanket Policy" limit of $7,394,389.74 for the loss of Building 1. Boardwalk also filed a third-party action against its insurance agent, T.S.A., Inc. d/b/a/ The Sloan Agency ("TSA") for negligent procurement of insurance, breach of fiduciary duty, and breach of contract. The third-party complaint alleges an alternative claim that "if State Auto's allegations are true," Boardwalk was required to obtain 100% replacement cost coverage for the Boardwalk structures.

In an Order dated February 15, 2008, United States District Judge Nanette Laughrey ruled on the parties' cross motions for summary judgment. The court granted summary judgment to TSA because it did not have the requisite agency relationship with Boardwalk. The court granted partial summary judgment to Boardwalk on whether it has a right to replace Building 1 and repair Building 4. The court granted partial summary judgment to State Auto on the issue of coinsurance: because the Kansas Valued Policy Statute did not apply to this claim, the coinsurance provision applies to potentially reduce Boardwalk's recovery. The court also ruled that the exclusion for reimbursement for extra costs incurred to comply with modern laws and ordinances was not void against public policy. In a subsequent order ruling on the parties' supplemental motions for summary judgment on two of Boardwalk's counterclaims,[34] the court declined to retain jurisdiction over the insurance dispute, clarifying the scope of the claims in that case as follows:

> Boardwalk confuses the Court's declaration that it has a right to replace, which was the necessary converse of State Auto's declaratory judgment claim, with actually prevailing under its breach of contract claims and receiving a right to recover damages.

[34]On March 14, 2008, Judge Laughrey vacated her February 15 Order to the extent it granted summary judgment on Counts III and IV of Boardwalk's counterclaims, as State Auto had not sought summary judgment on those counterclaims. She directed supplemental briefing on the remaining issues.

In fact, the Court held that Boardwalk did not succeed on its breach of contract claims specifically because it had not replaced the property. *See State Auto*, 2008 WL 474333, at *8. Boardwalk, as it admits, has not yet replaced the damaged and destroyed property; therefore, State Auto has not yet refused to pay all of the replacement costs. There is simply no case or controversy for the Court to adjudicate, and Article III does not extend so far as to allow the Court to "retain" jurisdiction until such a case or controversy arises. Whether State Auto will pay replacement costs for property that Boardwalk has yet to replace is too speculative and indeterminate at this time. . . .

. . . .

If Boardwalk chooses to replace its destroyed property, and if State Auto refuses to pay all of the replacement costs (subject to Policy terms and limits), Boardwalk may bring another breach of contract action and seek attorneys fees. However, that would be a separate action. . . . This action, initiated by State Auto, was based on whether Boardwalk had a right to replace, not whether State Auto improperly refused to pay replacement costs already incurred. The Court, therefore, declines to retain jurisdiction.[35]

On April 17, 2008, the parties entered into and filed an Agreed Stipulation of Dismissal Without Prejudice. They stipulated: (1) to the issues *not* resolved by Judge Laughrey's Orders; (2) that the actual cash value of Building 1 at the time of the loss was $1,751,160; (3) that any statute of limitations applicable to the remaining claims shall be tolled for six months after the court's Orders, including any appeals, become final; (4) that Boardwalk has the right to replace Building 1 under the condition that it initiates the process of replacing the destroyed building by formally seeking municipal approval thereof, and proceeds to diligently replace the building within six months of the court's Orders, including any appeals, becoming final; and (5) that failure to do so will constitute a waiver of Boardwalk's right to replacement cost under the

---

[35]2008 WL 957666, at *3 (W.D. Mo. Apr. 3, 2008).

Policy and limit its recovery to the actual cash value of Building 1, further obligating it to refund State Auto $377,034.17 in excess monies previously paid by State Auto to Boardwalk.

On Boardwalk's appeal of the district court's summary judgment orders, the Eighth Circuit Court of Appeals ruled on July 14, 2009, affirming in part and reversing in part and remanding for further proceedings. The Eighth Circuit affirmed the district court's orders on all issues appealed except its ruling that the exclusion for reimbursement for extra costs incurred in order to comply with modern laws and ordinances was not void against public policy. On September 8, 2009, the district court vacated its "prior ruling regarding policy provisions limiting coverage for the cost of repair/replacement in order to comply with ordinances . . . [as] void as against public policy." The Missouri Litigation was finalized when Judgment was entered on September 8, 2009. Thus, the six-month period contemplated in the parties' April 17, 2008 Stipulation expired on March 7, 2010.

### Reconstruction

On October 22, 2008, before the Eighth Circuit ruled in the Missouri Litigation, Boardwalk submitted to the City of Lawrence site plan and building permit applications for four apartment buildings to replace Building 1. The first step in obtaining municipal approval of the project is approval of the site plan. The four buildings were to be constructed on approximately the same footprint as Building 1. Boardwalk also obtained a loan commitment from Commerce Bank to fund this reconstruction plan and solicited bids from general contractors. The City approved the applications, however, Boardwalk did not pick up the building permits.

In May 2009, Boardwalk notified its tenants that their leases would not be renewed because Boardwalk had been advised that the remaining apartment buildings in the complex do

not comply with fire safety standards for newly constructed apartment buildings. Fleischer testified that he understood that while those buildings are not required to comply with the standards for newly constructed buildings, "according to the City Code . . . they may very well be deficient if someone is injured or dies as a result of a defect."[36] He was concerned about legal liability for personal injuries. No further action was taken on the 2008 building permit application after July 2009; Boardwalk began working on a plan for the overall seven-acre Boardwalk complex site.

In October 2009, Boardwalk sought formal approval by the City of its site plan for the complex; it was approved on January 15, 2010. By letter dated January 26, 2010, Boardwalk's counsel provided State Auto's counsel with an update on Boardwalk's intention to rebuild Building 1 and informed it that Boardwalk's architect expected to file a building permit application by the middle of February 2010, and that this timeline should be within the parties' expectations. Counsel asked State Auto to advise Boardwalk "if it disagreed or had any concerns regarding the progress." Boardwalk's counsel also stated that he wanted to discuss the business income claim. Boardwalk's new plan for the complex involved building five new buildings, two of which would be on land occupied by buildings undamaged by the fire. State Auto did not respond to this letter by indicating disagreement or concern. On April 23, 2010, Boardwalk's counsel sent State Auto's counsel a disk containing a February 17, 2010 City of Lawrence application for a building permit, which was delivered to the City.

In a February 11, 2010 letter to State Auto's counsel, Boardwalk's counsel "confirm[ed] that the parties are treating the letter dated January 26, 2010 to you as Boardwalk's election to

---

[36]Doc. 212-12, Ex. O at 55–56.

rebuild the covered property. Please let me know if you have a different understanding."[37] State Auto did not respond to this letter or otherwise indicate that it believed Boardwalk had waived the right to rebuild.

The last tenants in the complex vacated their apartments in mid-February 2010 and demolition of the undamaged buildings began on March 25, 2010. In a July 30, 2010 letter, Boardwalk's counsel informed State Auto that "[a]fter some modifications, the City of Lawrence has approved Boardwalk's construction plans and issued a permit for construction. Construction has already begun."[38] Counsel further stated that he would like State Auto "to process the business income owed under the policy."[39]

On August 11, 2010, State Auto requested that Boardwalk provide business income loss documentation including, but not limited to, complete copies of Boardwalk's federal income tax returns. On September 29, 2010, Boardwalk's counsel confirmed that it was in the process of collecting the voluminous information requested in the August letter but stated that it did not believe additional documentation was necessary. On March 22, 2011, Boardwalk provided documents in response to State Auto's August 11, 2010 letter.

The City of Lawrence, Planning and Development Services Department, issued "Conditional" Certificates of Occupancy dated July 22, 2011 to Boardwalk, indicating 96 rental units were ready for occupancy. On July 26, 2011, Stacey M. Bowman, counsel for Boardwalk, sent a letter to counsel for State Auto, enclosing the certificates of occupancy and stating that

---

[37]Doc. 212-34, Ex. XX.

[38]Doc. 212-26, Ex. PP.

[39]*Id.*

"the property is now rebuilt for purposes of the lost income claim."[40]

On August 25, 2011, State Auto requested additional business income loss documentation. On October 17, 2011, Boardwalk provided documents in response to this letter.

On November 18, 2011, Bowman sent State Auto's counsel a letter advising that "reconstruction of Building 1 which was destroyed in the October 7, 2005 fire is complete. Please consider this letter as Boardwalk's lodging of its replacement cost claim pursuant to the Policy."[41]

Higher quality materials were used in the five apartment buildings Boardwalk built in 2010–2011 as compared to the original buildings. But Boardwalk did not use the actual costs it incurred as a baseline to estimate its replacement cost claim. Instead, Boardwalk's estimate for this claim is based on the bids it received to build the four apartment buildings under the original 2008 plan that was never actually constructed. Boardwalk estimates that the replacement cost of Building 1 in 2010, with layout and functionality as it existed in the original Building 1, utilizing like kind and quality of materials and contemporary methods of construction, and including additional costs of construction to comply with building codes and ordinances, is $3,408,957.00. Boardwalk's expert Paul Werner opined that assuming there had been no insurance dispute, Boardwalk could have replaced Building 1 no later than September 1, 2006, before the new Lawrence Development Code became effective. Compliance with the new Lawrence Development Code cost Boardwalk an additional $999,407 to replace Building 1.

In a December 12, 2011 letter, Boardwalk requested State Auto issue payment by

---

[40]Doc. 212-27, Ex. QQ.

[41]Ex. 212-28, Ex. RR.

December 29, 2011, for Boardwalk's business income losses from the date of loss through thirty days after the Conditional Certificates of Occupancy were issued on July 22, 2011.

In a November 18, 2011 letter to State Auto's counsel, Boardwalk requested that State Auto process Boardwalk's property loss claim for replacement costs of Building 1. In a December 8, 2011 letter, State Auto requested that Boardwalk complete "sworn proof of loss forms" and submit documentation supporting Boardwalk's property damage claim. Boardwalk produced documentation in support of its replacement cost claim to State Auto on February 22, 2012 and April 5, 2012. On August 9, 2012, Boardwalk submitted a "Revised Proof of Loss," which stated that the "Actual Amount of Loss and Damage" was $3,452,549.00 and the "Amount Claimed" was $3,447,549.00.

## III. Discussion

### A. Boardwalk's Property Damage Claim (Count II)

Boardwalk claims State Auto breached its obligations under the Policy by failing to pay the replacement cost of Building 1. Boardwalk relies on its expert to calculate the cost of replacing Building 1 in 2010, assuming like kind and quality materials and layout and features as existed in the destroyed Building 1, but using contemporary cost-effective methods of construction. Boardwalk contends that this amount, minus the $5000 deductible, results in outstanding replacement costs of $275,757 (over and above the amounts State Auto already paid) and it further maintains that the 100% coinsurance provision does not apply because Boardwalk was fully insured to its replacement cost value. Boardwalk argues that the costs associated with complying with new laws and ordinances passed in 2006 and 2008 are fully recoverable and are not subject to a coinsurance limitation.

State Auto argues that Boardwalk waived its entitlement to the replacement cost of Building 1 because it did not timely seek municipal approval to rebuild in accordance with the Stipulation signed by the parties in the Missouri Litigation. State Auto also contends that Boardwalk's property loss is limited by the Policy's coinsurance provision, so the total replacement cost owed under the Policy is in fact less than the amount State Auto has already paid Boardwalk, entitling it to a reimbursement.

Boardwalk seeks partial summary judgment on this claim to establish the legal extent of State Auto's liability for Boardwalk's property losses and to interpret the Policy's coinsurance provisions under Kansas law. State Auto argues that it is not liable for increased costs expended by Boardwalk to comply with new laws and ordinances passed by the City of Lawrence after the fire. State Auto also seeks summary judgment on its affirmative defense of estoppel, arguing that Boardwalk is judicially estopped from claiming damages for all buildings in the Boardwalk complex in an amount exceeding $13 million. In the alternative, State Auto argues that a judicial admission in the Missouri litigation estops Boardwalks from asserting that it was adequately insured.

### 1.     Waiver under the Stipulation

The Court first considers Boardwalk's motion for summary judgment on the issue of waiver under the April 17, 2008 Stipulation filed in the Missouri litigation, State Auto's eighth affirmative defense. State Auto, as the nonmoving party, bears the burden of proof on this issue.[42] State Auto alleges that it entered into a contract with Boardwalk—the April 17, 2008 Stipulation from the Missouri Litigation—and that Boardwalk failed to abide by the conditions

---

[42]*See* Pretrial Order, Doc. 170 at 47.

for obtaining the replacement cost for Building 1 in that contract.

Boardwalk contends that there is no genuine issue of material fact about whether it timely initiated reconstruction of Building 1 under the April 17, 2008 Stipulation because it is uncontroverted that it applied for and obtained site plan and building permit approval prior to March 7, 2010. The relevant portion of the Stipulation provides:

> The parties agree that Boardwalk has the right to replace Building #1 based on the condition that, within six months of the Court's Orders, including any appeals thereof, becoming final, Boardwalk has initiated the process of replacing the destroyed building by formally seeking municipal approval thereof and thereafter proceeds diligently to replace such building. If Boardwalk does not so proceed with the replacement of Building #1 within this six-month period, Boardwalk will have waived entitlement to replacement cost under its policy of insurance with State Auto . . . .[43]

It is undisputed that the deadline by which to "initiate[] the process of replacing the destroyed building by formally seeking municipal approval thereof" was March 7, 2010.

State Auto contends that there is a genuine issue of material fact about the meaning of the terms of the Stipulation and whether the building permit application was in fact filed before March 7, 2010. It maintains that Boardwalk's site plan application in October 2009 was insufficient to initiate municipal approval; it was required to submit the application for a building permit. State Auto further argues that there is no evidence that the February 2010 building permit application was ever filed with the City.

Generally, if the language in a written contract "is clear and can be carried out as written,

---

[43]Doc. 212-23, Ex. CC at 2.

there is no room for rules of construction."[44] "'In considering a contract which is unambiguous and whose language is not doubtful or obscure, words used therein are to be given their plain, general and common meaning, and a contract of this character is to be enforced according to its terms.'"[45] Here, the Court finds that the Stipulation can be enforced according to its plain terms. The Court disagrees with State Auto that there is a genuine issue of material fact about the meaning of the term "formally seeking municipal approval." The interpretation of a written contract is a matter of law, and if the terms are clear, the intent of the parties is to be determined from the contract language itself.[46] When read in context, the term "formally seeking municipal approval" is not ambiguous. The Stipulation provides that Boardwalk must have "initiated the process of replacing the destroyed building by formally seeking municipal approval thereof," prior to the deadline.

It is uncontroverted that approval of the site plan by the City of Lawrence was a prerequisite to applying for a building permit. It is also uncontroverted that Boardwalk applied for and obtained site approval before the March 2010 deadline. Because the site plan application is the first step in obtaining municipal approval for replacing the destroyed Boardwalk building, no reasonable jury could find that Boardwalk failed to "initiate" the process of replacing the destroyed building by "formally seeking municipal approval." The Stipulation does not require that Boardwalk apply for a building permit by the deadline and Werner's testimony makes clear

---

[44]*Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

[45]*Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 672 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[46]*Kan. Penn Gaming, LLC v. HV Props. of Kan., LLC*, 662 F.3d 1275, 1284–85 (10th Cir. 2011).

that it could not have applied for a building permit without approval of the site plan. There is no evidence in the record that controverts this testimony.

And even if State Auto's interpretation of the Stipulation is correct and Boardwalk must have applied for a building permit by March 7, 2010, there is no genuine issue of material fact that this did not occur. Boardwalk has come forward with evidence that it applied for a building permit on February 17, 2010—its counsel sent a letter to State Auto's counsel on April 23, 2010, enclosing a disk that contained the application. Paul Werner, the architect who completed the application, testified that he has "no doubt" that the building permit application was filed in February 2010. While it is true that the copy of this document, authenticated by Werner, does not indicate that it was received by the City, State Auto provides no evidence that it was not received by the City prior to March 7, 2010. Boardwalk points to the affidavit of Suzanne Rieger, an employee of Paul Werner Architects, who attests that she delivered the building permit application to the City of Lawrence before February 24, 2010. State Auto has not met its summary judgment burden of demonstrating a genuine issue of material fact about whether the building permit application was submitted to the City in February 2010.

Moreover, by letter to State Auto's counsel dated January 26, 2010, Boardwalk's counsel explained its intention to rebuild Building 1, and that Boardwalk's architect expected to file a building permit application by the middle of February 2010, a time line that should be within the parties' expectations. Counsel asked State Auto to let Boardwalk know "if it disagreed or had any concerns regarding the progress." It is uncontroverted that State Auto did not respond to this letter. State Auto argues that it had no duty to respond. Regardless of whether it had a duty to respond, its lack of response is further evidence that Boardwalk was in compliance with the

Stipulation, and it corroborates Rieger's affidavit and Werner's testimony.

State Auto has pointed to no evidence that the February 17, 2010 building permit application was not filed and approved by the City prior to March 7, 2010. Because State Auto carries the ultimate burden of proof on this affirmative defense, it may not rely on an absence of evidence to avoid summary judgment. The only evidence in the record about the February 17, 2010 application supports Boardwalk's position that it was filed in February 2010, ahead of the March deadline established by the Stipulation. Summary judgment is granted in favor of Boardwalk on State Auto's eighth affirmative defense; Boardwalk did not waive its right to elect replacement cost coverage under the Policy by failing to timely initiate the process of replacing the destroyed building by formally seeking municipal approval by the deadline established in the Stipulation.

### 2. Calculation of Replacement Cost and Application of Coinsurance

In the Missouri litigation, the district court determined that Boardwalk had the right to replace Building 1 and repair Building 4 after that litigation was resolved. The district court also determined that the coinsurance provision of the Policy applies to any replacement, so Boardwalk may not be entitled to the full replacement cost to the extent Boardwalk's property was underinsured. The Eighth Circuit Court of Appeals affirmed these determinations. In this litigation, the parties naturally dispute the application of the coinsurance provision to Boardwalk's replacement cost claim and therefore the proper calculation of replacement cost coverage.[47]

---

[47]State Auto's sixth affirmative defense is that the replacement cost claim is subject to the Policy's coinsurance provision.

Coinsurance is "a relative division of the risk between the insurer and the insured."[48]  A coinsurance provision in an insurance policy requires "'the insured to maintain coverage to a specified value of the property, and stipulate that, upon his or her failure to do so, he or she becomes a coinsurer and must bear his or her proportionate part of the loss.'"[49]

Section F.1 of the Policy provides:

> 1. Coinsurance
> If a Coinsurance percentage is shown in the Declarations, the following condition applies.
> a. We will not pay the full amount of any loss if the value of the Covered Property at the time of the loss times the coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.
>
> Instead, we will determine the most we will pay using the following steps:
> (1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;
> (2) Divide the Limit of Insurance of the property by the figure determined in Step (1);
> (3) Multiply the total amount of the loss, before the application of any deductible, by the figure determined in Step (2); and
> (4) Subtract the deductible from the figure determined in Step (3).
>
> We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.[50]

The district court in the Missouri litigation determined that the term "value," in this provision means "replacement cost" "when Boardwalk chooses replacement costs under Section G."[51]  The

---

[48]*Wenrich v. Employers Mut. Ins. Cos.*, 132 P.3d 970, 975 (Kan. 2006).

[49]*Id.* (quoting 15 Couch on Insurance § 220.3 (3d ed. 2005)).

[50]Doc. 212, Ex. B at 25–26.

[51]Doc. 212, Ex. AA at 15.

Eighth Circuit affirmed this interpretation. Therefore, when Boardwalk chooses replacement costs under the Policy, Boardwalk will be considered underinsured if the "replacement cost" of the "covered property" [the Boardwalk complex], times 100%, was less than the Policy limit of $7.3 million. "Replacement cost" is defined in Section G of the Policy. If Boardwalk is determined to be underinsured, then the coinsurance percentage is to be applied to "the total amount of the loss."

      **a.**      **Whether "Replacement Cost" Includes Costs to Comply with Modern Laws and Ordinances**

In the Missouri litigation, Boardwalk challenged sections E.4.b, E.7.b, and G.3.f, which limit Boardwalk's ability to recover costs attributable to enforcement of ordinances or law regulating the construction, use, or repair of any property. Section G.3.f. excludes "law and ordinance costs" from the definition of "replacement cost." The Eighth Circuit reversed the district court on this issue and found that the "limitations provisions" were void against public policy under Kansas law.

The Court is cognizant that the term "replacement cost" is used by the parties in two different contexts under the coinsurance provision. It is used to describe the replacement cost of the Boardwalk complex, which is one component of the coinsurance calculation. It also is used to refer to Boardwalk's property damage claim seeking the actual cost to replace Building 1. Boardwalk seeks summary judgment on the meaning of "replacement cost" in both contexts: (1) whether the "replacement cost" for the *complex*, a component of determining whether there is coinsurance penalty, now must include law and ordinance costs; and (2) whether the "replacement cost" for *Building 1*, which will be subject to any coinsurance penalty, should

include the increased construction costs associated with law and ordinance compliance, or rather, whether those expenses should be construed as "additional coverage" and not be subject to a coinsurance penalty.

Generally, "the interpretation or construction and meaning and legal effect of written instruments are matters of law exclusively for the court and not questions of fact for determination by the jury."[52] Under Kansas law, "if the language of the insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the senses and meaning of the terms used."[53] And the Court "should not strain to create an ambiguity where, in common sense, there is none."[54] The Court is to consider the terms of an insurance policy as a whole, taking care not to fragment the various provisions and endorsements.[55] An insurer has a "duty to define limitations to an insured's coverage in clear and explicit terms. To restrict or limit coverage, an insurer must use clear and unambiguous language. Otherwise, the insurance policy will be construed in favor of the insured."[56] When an insurance contract is not ambiguous, the Court enforces the contract as it is written, so long as it does not conflict with any applicable statute or violate public policy.[57] And if a contract is clear

---

[52] *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998).

[53] *Kemper Ins. Cos. v. Weber*, 168 P.3d 607, 610 (Kan. Ct. App. 2007). The parties agree that Kansas law applies to this insurance dispute.

[54] *Bugg*, 962 P.2d at 519.

[55] *Iron Horse Auto, Inc. v. Lititz Mut. Ins. Co.*, 156 P.3d 1221, 1226–26 (Kan. 2007); *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003).

[56] *Weber*, 168 P.3d at 611 (citations omitted); *see also Crist v. Hunan Palace, Inc.*, 89 P.3d 573, 577 (Kan. 2004).

[57] *Marshall*, 73 P.3d at 132; *Levier v. Koppenheffer*, 879 P.2d 40, 45 (Kan. Ct. App. 1994).

and unambiguous, "there is no room for rules of construction."[58]

Both parties claim that the policy language is unambiguous, but they have conflicting interpretations. State Auto moves for summary judgment that the term "replacement cost," as stated in Section G, must now include law and ordinance costs, impacting both the calculation of "replacement cost" of the complex and the cost to replace Building 1. Boardwalk argues that this interpretation is not supported by the language of the Policy because law and ordinance coverage is provided for under the "Additional Coverages" section of the Policy and was originally limited by a $10,000 cap, which is void in light of the Eighth Circuit's ruling on appeal. That provision states that "[t]his Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies." The original terms of the Policy excluded law and ordinance cost from the definition of "replacement cost," and instead provided for those costs as additional coverage. Nonetheless, the Court must now construe the Policy without that provision.

State Auto argues that the Eighth Circuit's decision, excising the law and ordinance costs exclusion from Section G, requires those costs to now be included in the calculation of replacement cost for the complex under the coinsurance provision. The Court agrees with Boardwalk that, construing the Policy as a whole, any increased costs to comply with modern laws and ordinances should not be included in the calculation of replacement cost under section G. The coinsurance provision states that State Auto will not pay the full amount of loss if the "value" of "Covered Property" shows that it is underinsured. "Value" means "replacement

---

[58] *See, e.g.*, *Decatur County Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999) (quotation omitted).

cost," as defined in Section G.3, as held in the Missouri litigation. "Covered Property" is defined in Section A.1 of the Policy as "the type of property described in this Section, A.1., and limited in A.2." Additional Coverages in section A.4 , rather than replacement cost coverage, provides coverage for law and ordinance costs. Because the "value" of the "Covered Property" is used to determine the coinsurance percentage, the plain language of the Policy suggests that law and ordinance costs should not be factored into the replacement cost of the complex. Therefore, the Court finds that even without the exclusion found in G.3.f, the calculation of replacement cost for purposes of determining the coinsurance percentage does not include law and ordinance costs.

The Court is not persuaded by State Auto's argument that including these costs in section G adheres to the parties' original intent to allocate the risks between Boardwalk and State Auto. The original intent of the Policy was to allocate the risks *if* the complex was deemed to be underinsured, based on an agreed limit of about $7.3 million. As State Auto contends, "an insured party can completely avoid retaining *any* portion of the risk by making sure that it insures the properties to their proper value."[59] Yet it is uncontroverted that the Policy limit that applies here was based on the parties' estimate under the terms of the original Policy language that excluded law and ordinance costs from the calculation of "replacement cost." The Court cannot conclude that the policy limit would have been the same had the parties freely entered into the contract without the law and ordinance limitations. Therefore, including law and ordinance costs in the calculation of replacement cost of the complex, for purposes of

---

[59]Doc. 230 at 29.

determining the coinsurance penalty in this case, would subject the parties to a result that was clearly not their intent. Under the coinsurance provision of the Policy, the replacement cost of the complex does not include the increased costs expended in complying with modern laws and ordinances.

The Court also agrees with Boardwalk that under State Auto's interpretation of the Policy, law and ordinance coverage would be found under two sections of the Policy—as part of the replacement cost, and as additional coverage. The Court alternatively finds that this interpretation of the Policy would lead to an ambiguity that requires a construction that favors Boardwalk. If replacement cost now includes law and ordinance costs, then the additional coverage provision is superfluous since it only applies when the insured elects replacement cost coverage. If the contract is deemed ambiguous, "the construction most favorable to the insured prevails. This is so because the insurer, as the one who prepared the contract, must suffer the consequences of failing to make the terms clear."[60]

Boardwalk next argues that it is entitled to recover all law and ordinance costs for Building 1, without reduction by coinsurance. As already discussed, the Policy provides that if the insured elects replacement cost coverage, additional coverage applies for increased costs associated with complying with building laws and ordinances in the course of repairing or replacing the property. The original Policy language limited this additional coverage to $10,000, a limitation that is now void as against public policy under the Eighth Circuit's ruling. Again, the Court looks to the plain language of the Policy when read as a whole. After determining the

---

[60]*City of Salina, Kan. v. Maryland Cas. Co.*, 856 F. Supp. 1467, 1475–76 (D. Kan. 1994) (citations omitted).

coinsurance percentage, the insurer determines coverage by multiplying the "total amount of loss," by the coinsurance percentage and then subtracts the deductible. Unlike the determination of "replacement cost" as the measure of "value" under the coinsurance provision, the coinsurance penalty is applied to "the total amount of loss." The plain language of section A of the Policy provides for the various types of "loss" covered and excluded, including the components of the "Additional Coverages" section of the Policy. The exclusion found in the Special Causes of Loss Form would not apply in light of the Eighth Circuit's decision. Therefore, the Court finds that the law and ordinance costs are part of the "total amount of loss" that is subject to the coinsurance provision.

The Court grants Boardwalk's motion for summary judgment and denies State Auto's motion for summary judgment on the issue of whether the "replacement cost" of the complex includes law and ordinance costs. For purposes of calculating the coinsurance percentage under the Policy, the replacement cost of the complex does not include the increased costs expended in complying with modern laws and ordinances. However, the Court denies Boardwalk's motion for summary judgment on the issue of whether the coinsurance limitation applies to the law and ordinance costs incurred to replace Building 1. To the extent a coinsurance penalty applies in this case, it must be applied to the entire loss, including law and ordinance costs.

### b. Judicial Estoppel

State Auto and Boardwalk move for summary judgment on State Auto's fifteenth affirmative defense, judicial estoppel. State Auto claims that Boardwalk should be judicially estopped from asserting that the replacement cost for the complex is less than $13,291.356, the amount it asserted in the Missouri litigation. Boardwalk argues that the calculation of

replacement cost under the Policy was not at issue in the Missouri litigation, so it should not be bound by its arguments on that issue in this case.

Judicial estoppel is an equitable doctrine, which protects "'the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"[61] As an equitable doctrine, the Court must consider all of the equities of the case.[62] As a result, the circumstances under which a court might invoke judicial estoppel will vary.[63] But typically, three factors "inform the decision whether to apply the doctrine in a particular case."[64] First, a party's later position must be clearly inconsistent with its previous position.[65] Second, a court should determine whether the party "succeeded in persuading a court to accept that party's former position, 'so that judicial acceptance of an inconsistent position in a later proceeding would create the *perception* that either the first or the second court was misled.'"[66] Third, the court should determine whether the party "would gain an unfair advantage in the litigation if not estopped."[67] While these factors may inform the Court's decision, they are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual

---

[61] *Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007).

[62] *See New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001).

[63] *Id.*

[64] *Eastman*, 493 F.3d at 1156.

[65] *Id.*

[66] *Id.*

[67] *Id.*

contexts."[68]  Judicial estoppel should be applied "both narrowly and cautiously."[69]

The basis for State Auto's counterclaim is that Boardwalk relied on an expert opinion in the Missouri litigation that the replacement cost for the complex was much higher than the expert opinion it relies upon in this litigation.  Its original expert estimated a replacement cost of $13,291.356, which Boardwalk argues was later amended down to $10,966,777, and was based on a publication and software program called the Marshall Valuation Service.  By contrast, in this litigation, Boardwalk relies on Werner, the architect of the Boardwalk reconstruction, who bases his estimate on actual construction bids.

The Court agrees that Boardwalk has taken an inconsistent position with respect to the replacement cost of the complex between the two cases, however, the Court cannot find that the second and third judicial estoppel factors apply here.  There is no indication in the record that Boardwalk persuaded Judge Laughrey to accept its expert's calculation of replacement cost under the Policy.  Indeed, this fact is not included in the summary judgment rulings.  Judge Laughrey instead made clear that she could not say whether "Boardwalk is entitled to full replacement cost once the building is replaced, because the calculation of the coinsurance clause is unknown at this time."[70]  She stated in her supplemental summary judgment order that  "[t]his action, initiated by State Auto, was based on whether Boardwalk had a right to replace, not whether State Auto improperly refused to pay replacement costs already incurred."[71]  The issue

---

[68]*New Hampshire,* 532 U.S. at 751.

[69]*Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227 (10th Cir. 2011) (quotation omitted).

[70]Doc. 212, Ex. AA at 12.

[71]Doc. 212, Ex. BB at 6.

of how to calculate replacement cost under the Policy was not before the court in the Missouri litigation and the Court therefore declines to find that the Western District of Missouri was persuaded by an expert opinion that had no bearing on its rulings in that case.

Moreover, allowing Boardwalk to assert an expert opinion of a lower replacement cost in this litigation will not allow State Auto an unfair advantage. To the extent State Auto contends that Boardwalk has taken an inconsistent position on its replacement cost calculations, it can cross examine Werner and present the various calculations to challenge the weight of Boardwalk's evidence on the issue. Because the Court declines to apply judicial estoppel to these facts, Boardwalk's motion for summary judgment is granted and State Auto's motion is denied on this affirmative defense.

### c. Doctrine of Judicial Admission

In the alternative to its judicial estoppel affirmative defense, State Auto moves for summary judgment under the doctrine of judicial admission. "Judicial admissions are formal admissions which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact."[72] State Auto points to a brief that Boardwalk filed in the Missouri litigation in which it stated that if "value" in the coinsurance provision meant "replacement cost," then Boardwalk's coverage was "far less than 100% of replacement cost" for Building 1.

But "in the Tenth Circuit, briefs are not part of the record, and statements made in briefs may be considered admissions at the court's discretion."[73] Here, State Auto asks the Court to

---

[72]*Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 716 (10th Cir. 1993) (quoting *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988)).

[73]*Id.*

consider an admission in the form of a statement by Boardwalk in a brief filed in a different case before a different court. The statement at issue was made within the context of an alternative claim against Boardwalk's insurance agent.[74] Moreover, as stated above, the issue of whether Boardwalk was in fact underinsured was a question explicitly left open in the Missouri litigation. Under these circumstances, the Court declines to exercise its discretion and consider this statement a judicial admission. Defendant's motion for summary judgment on its judicial admission affirmative defense is denied and Boardwalk's motion is granted.

**B.     Boardwalk's Business Income Claim**

Under the Policy, State Auto is obligated to pay for the "actual loss" of "business income" sustained by Boardwalk due to the necessary "suspension" of its "operations" during the "period of restoration." Boardwalk claims that State Auto breached its policy obligations to pay for Boardwalk's rental business income losses up to the Policy limits. The parties dispute the appropriate "period of restoration." The parties also dispute the proper measure of calculating any business income losses due under the Policy. Boardwalk maintains that it reached an agreement with Bello on the amount to be paid in 2006. State Auto denies any agreement in 2006, and contends that any business income loss must be offset by income earned on the investment of its advance payment in 2006. Due to State Auto's alleged wrongful delay in meeting its replacement cost obligations on the property damage claim, Boardwalk claims that it is entitled to business income losses in excess of the Policy limits as well as prejudgment interest.

---

[74]*See U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005) ("inconsistent statements made in the alternative are not formal, deliberate declarations that could reasonably be construed as judicial admissions.").

### 1.    Period of Restoration

State Auto moves for summary judgment that the "period of restoration" for calculating Boardwalk's business income benefits under the Policy is the fifteen-month period beginning on October 7, 2005 and ending on January 10, 2007.  State Auto argues that the theoretical period of restoration is not extended by the delay associated with litigation, and points to Werner's testimony that Boardwalk could have replaced Building 1 in eleven months.[75]  Adding four months to account for the time it took State Auto to make its indemnity payment, State Auto argues that Boardwalk is entitled to no more than fifteen months of restoration.  Boardwalk moves for summary judgment that it is entitled to benefits from October 7, 2005 to thirty days after Building 1's reconstruction.

The Policy provides that the "period of restoration" "[b]egins immediately after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises."[76]  In this case, it ends on the date "when the property at the described premises *should be* repaired, rebuilt or replaced with reasonable speed and similar quality."[77] The Policy further provides that the period of restoration "does not include any increased period required due to the enforcement of any ordinance or law that: (1) regulates the construction, use or repair, or requires tearing down of any property."[78]

---

[75]State Auto's expert opined that Boardwalk's period of restoration under the business income provision was twenty-four months.

[76]Doc. 212, Ex. B at 51.

[77]*Id.* at 43 (emphasis added).

[78]*Id.* at 51.

The parties dispute when the period of restoration ends. The issue turns on the meaning of the Policy language "when the property . . . should be . . . replaced with reasonable speed and similar quality." Courts construing similar policy language conclude that it refers to the theoretical time period it takes to resume business.[79] Several courts have held that an extension is appropriate for the period of delay attributable to the insurer's failure to adjust the loss under the Policy within a reasonable amount of time.[80] In these cases, courts have found that but for the insurers' refusal to pay the amount owed under the Policy, the insureds could have promptly restored their business operations.[81] These courts further reason that when writing the Policy, the insurer could have anticipated that the restoration period would include contentious litigation and adjustment periods.[82]

The theoretical period of replacement can be measured by the actual period of replacement in some cases, often where the insured has already rebuilt by the time the question is presented to the court.[83] While the theoretical period is the outside limit, regardless of actual replacement time, so long as the insured

---

[79]*See, e.g.*, *Hampton Foods, Inc. v. Aetna Cas. & Sur. Co.*, 843 F.2d 1140, 1143 (8th Cir. 1988); *Bard's Apparel Mfg., Inc. v. Bituminous Fire & Marine Ins. Co.*, 849 F.2d 245, 251–52 (6th Cir. 1988); *Vermont Mut. Ins. Co. v. Petit*, 613 F. Supp. 2d 154, 160–61 (D. Mass. 2009); *Midland Broadcasters, Inc. v. Ins. Co. of N. Am.*, 636 F. Supp. 165, 167–68 (D. Kan. 1986); *Eureka-Security Fire & Marine Ins. Co. v. Simon*, 401 P.2d 759, 763 (Ct. App. Ariz. 1965); *SR Int'l Business Ins. Co. v. World Trade Ctr. Props., LLC*, No. 01CIV. 9291 (MBM), 2005 WL 827074, at *1 (S.D.N.Y. Feb. 15, 2005), *clarified by* No. 01 Civ. 9291HB, 2007 WL 519245 (S.D.N.Y. Feb. 16, 2007).

[80]*See Hampton Foods, Inc.*, 843 F.2d at 1143–44; *Petit*, 613 F. Supp. 2d at 160–61.

[81]*See, e.g., Hampton Foods, Inc.*, 843 F.2d at 1144.

[82]*See Petit*, 613 F. Supp. 2d at 161.

[83]*SR Int'l Business Ins. Co.*, 2005 WL 827074, at *7 (discussing *Alevy v. Alliance Gen. Ins. Co.*, No. 95-56034, 1996 WL 623065, at *3 (9th Cir. Oct. 24, 1996)); *Midland Broadcasters, Inc.*, 636 F. Supp. at 168.

> rebuilds with "reasonable speed" and "similar quality," as required
> by the policy here, the actual period should coincide with the
> theoretical period.  It is only where an insured party fails to
> comply with such policy terms, or in the rare case where an
> insured rebuilds more quickly than anticipated, that a gap between
> the actual and theoretical periods will arise.  In such cases, it is the
> theoretical, not the actual, period of restoration that governs.[84]

Boardwalk argues that the period of restoration must account for the delay caused by the insurance dispute because the Missouri litigation necessarily extended its business interruption. Because its right to replacement cost was at issue in the Missouri litigation, it contends that it could not proceed to rebuild and restart its business until that court ruled in 2008.  From that point, Boardwalk argues that it diligently pursued replacement of Building 1 and is therefore entitled to business losses through thirty days after the date of actual replacement, August 21, 2011.[85]  Boardwalk points to the district court's decision in the Missouri litigation that it did not unreasonably delay replacing the property under section G.3.c of the Policy given State Auto's initiation of that lawsuit.

State Auto argues that the delay was not due "solely" to its actions and that it did not withhold payment, as the insurers did in *Hampton Foods* and *Petit*.  It argues that the indemnity payment could have been used to replace Building 1.  State Auto argues that Boardwalk did not act with "reasonable speed" in rebuilding, so the period of restoration is shorter than the actual period of restoration.

While the Court does not agree with Boardwalk that the doctrines of res judicata, collateral estoppel, and law of the case require the Court to find that any delay in reconstruction

---

[84]*SR Int'l Business Ins. Co.*, 2005 WL 827074, at *7 (citations omitted).

[85]The Policy provides for extended coverage for thirty days after the date rebuilding is complete.

was caused by State Auto, the Court does find persuasive Judge Laughrey's decision that Boardwalk did not unreasonably delay replacing its property under the replacement cost claim limitations in the Policy by waiting until the Missouri litigation had been adjudicated.[86]  There is no genuine issue of material fact about whether it was reasonable for Boardwalk to delay reconstruction of Building 1 until its right to rebuild was determined in the Missouri litigation, litigation that was initiated by State Auto.[87]  The indemnity payment was subject to a non-waiver agreement.  In the Missouri litigation, State Auto challenged the amount of the indemnity payment, so Boardwalk reasonably believed that at least a portion of that payment may be subject to reimbursement.  The period of the Missouri litigation, March 27, 2006–September 8, 2009, should therefore extend the restoration period under the Policy.

The Court has already ruled on the replacement cost claim that Boardwalk complied with the requirements set forth by the parties themselves in the Stipulation they filed in the Missouri case.  Boardwalk acted diligently under the terms of the Stipulation in initiating the reconstruction of  Building 1.  However, there is a genuine issue of material fact about whether, Boardwalk acted with "reasonable speed" in rebuilding once the Missouri litigation concluded, thus requiring a shorter theoretical period of restoration than the actual replacement time.  This is a separate question from whether Boardwalk initiated the process in a timely manner.  Boardwalk will submit evidence at trial that the actual period of reconstruction was conducted

---

[86]Judge Laughrey's decision construed the 180-day limitation on timely replacement under the Policy, language not at issue in this case.

[87]*See* Doc. 51 at 6–7 ("Defendant caused a delay in processing Plaintiff's claims . . . by filing suit seeking to avoid payment on Plaintiff's policy.  This delayed action on the claims by more than three years and the Court will not now punish Plaintiff for a delay Defendant instigated."); Doc. 72 at 6 ("Under the facts as alleged, Plaintiff could not file its replacement cost claim without knowing its full replacement cost, and Plaintiff could not proceed on construction of its building before it knew that Defendant would pay the replacement cost, not a lesser valuation.").

with reasonable speed and similar quality.  But State Auto controverts this evidence with its own expert opinion and with Werner's testimony.  State Auto also contends that it was unreasonable for Boardwalk to change its plans for replacing Building 1 with a five building plan in 2010, prolonging the reconstruction.  While Boardwalk is correct that Werner qualified his opinion that reconstruction should have taken eleven months by stating that such an estimate is absent the insurance dispute, the jury is entitled to weigh this testimony in its finding on the appropriate measure of the restoration period.  Because a reasonable fact finder could conclude that the period of reconstruction was not undertaken with "reasonable speed," given the competing expert opinions on the theoretical time for reconstruction, the Court will grant in part and deny in part the parties' cross motions for summary judgment on this limited issue.  While there is no genuine issue of material fact that the period of restoration should be extended by the period of the Missouri litigation from March 26, 2006 until September 8, 2009, there is a genuine issue of material fact about when the theoretical period of restoration otherwise ends.

### 2. Calculating Business Income Loss

### a. Gross Profits Earned by Boardwalk

State Auto argues that it is entitled to summary judgment that under the Policy, the proper method for calculating Boardwalk's business income benefits is net income that should have been earned during the period of restoration, plus continuing normal operating expenses actually incurred during the period of restoration, minus gross profits actually earned during the period of restoration.  Boardwalk argues that summary judgment should be granted that Bello's calculation of business income is the proper measure of its benefits, and disputes that gross profits from State Auto's advance payments should reduce such benefits.

The first two components of State Auto's calculation are proper under the plain terms of the Policy, which defines "business income" as net income and continuing normal operating expenses incurred, including payroll. To support its gross profits reduction argument, State Auto cites to the Policy reference to "actual loss" of business income. Specifically, in the "coverage" section, the Policy states that State Auto "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" Since Boardwalk's coverage includes "Rental Value," "operations" is defined as "[y]our business activities occurring at the described premises" and "[t]he tenantability of the described premises." Under section C.3, the loss determination section, the Policy provides that the loss will be determined based on the net income before the loss, the likely net income if no loss had occurred (notwithstanding an increase in business due to favorable business conditions caused by the loss itself), the operating expenses, and "other relevant sources of information," including the insured's financial records, business records, and contracts or deeds.

The Court agrees that the Policy language allowing Boardwalk to recover for "actual loss" of "business income" means that it must back out from the loss any interest income Boardwalk earned during the period of restoration that was available to pay Boardwalk's expenses. The case law establishes that under similarly worded policies, "[a] claimant shows "actual loss" where the net profits of its business prior to the loss are greater than the net profits of its business after the loss."[88] The rationale behind these decisions is that a business income loss policy "is designed to do for the insured in the event of business interruption . . . just what

[88]*Eidelman v. State Farm Fire & Cas. Co.*, No. 10-2578, 2011 WL 198501, at *4 (E.D. Pa. Jan. 19, 2011) (citing *Berkeley Inn, Inc. v. Centennial Ins. Co.*, 422 A.2d 1078, 1080 (Pa. Super. 1980)); *see also Polymer Plastics Corp. v. Hartford Cas. Ins. Co.*, 389 F. App'x 703, 705 (9th Cir. 2010).

the business itself would have done if no interruption had occurred."[89] It is not designed to put the insured in a better position than it would have been without the interruption.[90] Allowing Boardwalk to profit from the advance payment from State Auto, as well as recover its net income and operating expenses, would give Boardwalk a windfall rather than compensate for its "actual loss" dictated by the Policy language.

Boardwalk argues that the cases cited by State Auto are inapposite because they all deal with crediting income generated by a resumption of normal business operations. There is no dispute that Boardwalk did not resume normal business operations for Building 1 during the yet-to-be-determined period of restoration.[91] But the Court does not find the distinction material because the same reasoning applies with any income generated by Boardwalk from investing the indemnity payment during the period of restoration, whether it was used for normal business operations or not. There is no dispute that any income received on the investment was available to pay Boardwalk's expenses. To allow Boardwalk to recover for actual loss that does not take into account gross profits received on the indemnity payment would contravene the purpose of business income loss policies and provide Boardwalk a windfall. Neither the terms of the Policy itself, nor the case law supports this approach.

While the Court agrees that actual gross profits should be backed out of the net income payable to Boardwalk on this claim, the amount of these gross profits is in dispute. There is a

---

[89]*Nat'l Union Fire Ins. Co. v. Anderson-Pritchard Oil Corp.*, 141 F.2d 443 (10th Cir. 1944).

[90]*Eidelman*, 2011 WL 198501, at *5.

[91]State Auto argues that Boardwalk continued to conduct its rental business on the other buildings in the complex, but does not put forth any evidence about these figures into the record, nor does it contend that this income is deductible from the net income and operating expenses that would otherwise be payable as business income.

genuine issue of material fact about whether Boardwalk "actually earned" interest in the amounts asserted by State Auto on the partial payment. The parties dispute the significance of Boardwalk's tax statements and whether the interest amounts are actually earned, or simply accrued for tax reporting purposes. And the parties specifically dispute the amount of interest Boardwalk earned in 2006. State Auto's motion for summary judgment is denied on this point. And because the Court finds that the business income calculation under the Policy must include a reduction for any gross profits earned by Boardwalk, State Auto's Eleventh affirmative defense for a set off, argued in the alternative, is moot.

**b.     Bello's Income Loss Figures**

Boardwalk moves for summary judgment that the proper business income benefit should be based on Bello's income loss figures from 2006. Boardwalk contends that the correspondence between Bello and Boardwalk created a contract between the parties through the doctrine of ratification since State Auto failed to repudiate those figures until years later, during this litigation.

> Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority. The ratification by the principal of an unauthorized act of his agent is equivalent to an original grant of authority. On acquiring knowledge of the unauthorized act of an agent, the principal should promptly repudiate the act, otherwise it will be presumed he has ratified and affirmed the act.[92]

It is uncontroverted that by letter dated February 1, 2006, Mr. Bello, State Auto's independent adjuster, reported to State Auto that Mr. Bello had "reached an agreement" with Boardwalk

---

[92]*Theis v. duPont, Glore Forgan Inc.*, 510 P.2d 1212, 1215 (Kan. 1973).

"regarding the claim for Business Income" subject to State Auto's "final decision with respect to coverage and the amount paid."[93]  In his February 1, 2006 letter, Mr. Bello reported to State Auto that Mr. Bello and Boardwalk agreed that "[t]he monthly Business Income claim is $18,296.24" subject to "adjustment" for reduced real estate taxes.[94]  But this correspondence was between Bello and State Farm, not between Bello and Boardwalk.  And Bello made it clear that the figures were subject to final approval by State Auto.  Moreover, Bello noted that Boardwalk had declined to agree on a duration for its loss.

Assuming Bello acted as State Farm's agent, he must have formed an agreement with Boardwalk in order to bind State Auto, which required a meeting of the minds on all essential terms.[95]  There was quite clearly no final agreement between Bello and Boardwalk on the business income figures, or how long they should be paid.  While State Auto's delay in processing this claim, and failure to communicate its position outside of the context of litigation, is likewise clear from the record, it does not rise to the level of ratification of an unauthorized act of its agent.  Both parties understood as of April 17, 2008, that the business income loss claim, including the period of restoration, was an open issue because they specifically included it as such in the Missouri Litigation Stipulation.  Post-Stipulation, Boardwalk repeatedly asked State Auto to process its business income claim and State Auto asked for supporting documentation.  These facts belie Boardwalk's contention that Bello somehow bound State Auto to his income loss figures such that State Auto was required to repudiate his actions.  Instead, there is no

---

[93]Doc. 215-1, Ex. 1.C.

[94]*Id.*

[95]*See, e.g.*, *Albers v. Nelson*, 809 P.2d 1194, 1198 (Kan. 1991).

genuine issue of material fact that Boardwalk did not believe the business income claim was resolved after Bello's adjustment of the claim. Boardwalk's motion for summary judgment is denied on this point.

In sum, the Court finds that neither State Auto nor Boardwalk has established the amount of business income loss as a matter of law; it is a decision for the fact finder. The jury will hear evidence of Bello's calculations to be sure, but it must calculate the actual loss under the terms of the Policy as set forth by the Court in this Order, which includes a reduction for any gross profits actually earned by Boardwalk during the period of restoration.

### c.      Saved Depreciation

State Auto's expert, Randall Wilson, calculated Boardwalk's business income losses with a reduction for saved depreciation in the amount of $2479 per month.[96]  Boardwalk moves for summary judgment that any saved depreciation on Building 1 should not be deducted from its recovery on this claim.  State Auto argues that a deduction for saved depreciation must be applied to avoid Boardwalk receiving a windfall profit by receiving both reimbursement for the destroyed asset on the replacement cost claim, and for the asset's saved depreciation on the business income claim.

 The Policy provides that loss is determined based on "[t]he operating expenses, including payroll expenses, necessary to resume 'operations' with the same quality of service that existed just before the direct physical loss or damage."[97]  The parties dispute the meaning of "necessary to resume operations."  State Auto relies on the Appellate Court of Illinois' decision

---

[96]Doc. 215, Ex. 21A.

[97]Doc. 212, Ex. B at 48.

in *Cohen Furniture Co. v. St. Paul Insurance Co.*,[98] which construed a business interruption policy that covered "earnings."  That policy explicitly excluded expenses that "become unnecessary during the halt . . . in business operations," and found that the insurer properly deducted depreciation charges because "once an asset has been destroyed, an insured cannot charge a depreciation expense."[99]

The next year, the Supreme Court of Illinois decided *Grevas v. United States Fidelity & Guaranty Co.*[100]  There, the court considered whether depreciation was properly deducted from gross rental income as a "noncontinuing expense" under a business interruption policy that included rental income coverage.  That court distinguished *Cohen*, and the cases cited therein, as applying to policies that cover loss of earnings.[101]  The policy in *Grevas* covered loss of rental value, which is designed to protect the "cash flow" of the business, whether tax deductible or not.[102]  The court concluded that depreciation is an accounting factor, for tax purposes, and is not an out-of-pocket expense that affects the cash flow of the business.[103]  Therefore, the court found that it should not be deducted from the insured's rental loss benefits.[104]  Boardwalk urges the

---

[98] 573 N.E.2d 851 (Ill. App. Ct. 1991).

[99] *Id.* at 857.

[100] 604 N.E.2d 942 (Ill. 1992).

[101] *Id.* at 945–46.

[102] *Id.* at 947.

[103] *Id.*

[104] *Id.*; *see also Vermont Mut. Ins. Co. v. Petit*, 613 F. Supp. 2d 154, 160–61 (D. Mass. 2009) (finding depreciation is not a discontinuing expense under lost rental income policy based on cash flow analysis); *Briggs v. Briggs*, 817 A.2d 112, 118–19 (Conn. App. Ct. 2003) (affirming lower court decision that depreciation should not be deducted in calculating net revenues because they are not out-of-pocket rental expenses); *Central States, S.E. & S.W. Areas Pension Fund v. Midwest Freightways, Inc.*, No. 07-CV 2149, 2009 WL 595694, at *6–7 (N.D. Ill. Mar. 9,

Court to follow *Grevas* and other cases that hold depreciation is not a noncontinuing expense.

The Court is persuaded that the *Grevas* line of cases controls this question. In the rental value context, depreciation should not be treated as a noncontinuing expense that should be deducted from Boardwalk's business income benefit. Boardwalk's business income claim is for rental value, and under the cases construing policies that apply to such rental income, only out-of-pocket expenses that affect cash flow should be deducted; depreciation is instead an accounting figure for tax purposes. Boardwalk's summary judgment motion is granted on this issue.

**d.  Coinsurance**

Boardwalk moves for summary judgment that the coinsurance penalty in the business income portion of the Policy does not apply here because Boardwalk was not underinsured, pointing to State Auto's expert's admission that Boardwalk was not underinsured, under the definition set forth in the Policy. State Auto does not respond to this argument and the Court agrees that State Auto has not met its burden of coming forward with evidence to show there is a genuine issue of material fact that Boardwalk was underinsured under the business income portion of the policy, such that the coinsurance provision should apply. Boardwalk's motion for summary judgment on this affirmative defense is granted.

**3.  Other Relief Sought by Boardwalk**

**a.  Consequential Damages**

The policy limit on business income coverage in this case is $1,099,200. Boardwalk

2009) (construing "reasonable and necessary costs" under settlement agreement concerning real estate leasing activity as limited to out-of-pocket expenses "actually incurred with respect to the lease of the Properties," which does not include depreciation).

argues that it is entitled to consequential damages on the replacement cost claim in the amount of its business income loss that exceeds the policy limit. Boardwalk argues that State Auto unreasonably delayed its replacement cost obligations, increasing its business income losses. State Auto responds that Boardwalk could continue to conduct business in the buildings that were not affected by the fire and that it is not otherwise entitled to recover damages in excess of the policy limit.

The Court agrees with Boardwalk, that if State Auto is found liable under Kansas law on the replacement cost claim, Boardwalk could recover actual damages in the amount of State Auto's replacement cost obligation under the policy, as well as consequential damages. The damages available for breach of an insurance contract are the same as those for breach of any contract.[105]

> [T]he damages recoverable for breach of contract are limited to those which may fairly be considered as arising, in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach.[106]

Such damages may be recovered notwithstanding the policy limit on the insurance coverage at issue.[107] The Court finds that consequential damages may be recovered by Boardwalk so long as it is able to satisfy the standard set forth above—that the business income losses either arose in the usual course of things, from the breach itself, or that the damages were reasonably assumed

---

[105] *See, e.g.*, *Earth Scientists (Petro Servs.) Ltd. v. United States Fidelity & Guaranty Co.*, 619 F. Supp. 1465, 1475 (D. Kan. 1985).

[106] *Hochhman v. Am Family Ins. Co.*, 673 P.2d 1200, 1203 (Kan. Ct. App. 1984); *see also Earth Scientists*, 619 F. Supp. at 1475.

[107] *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.*, 895 F.2d 670, 673, 679 (10th Cir. 1990); *Conner v. Occidental Fire & Cas. Co.*, 135 P.3d 1230, 1242 (Kan. 2006).

to be within the contemplation of the parties. Because business income losses that may be above and beyond the policy limit would obviously not be awarded as actual damages, there is no risk of Boardwalk receiving a windfall.

State Auto argues that Boardwalk cannot show business income loss as consequential damages to the breach of contract because State Auto advanced payment to Boardwalk, which was then invested for a return. State Auto argues that this fact distinguishes it from the cases finding consequential damages are appropriate, because those cases all involved nonpayment by the insurer. The Court does not find that the fact of State Auto's advance payment means that Boardwalk is not entitled to consequential damages as a matter of law. The Court has already determined that any income earned on the advance payment must be backed out of the business income calculation. If the jury determines that, after this reduction, Boardwalk suffered business income losses in excess of the business income policy limit, and that those losses flowed from the breach of the replacement cost provision in the policy, then it may properly award Boardwalk that sum in the form of consequential damages.

However, the Court also declines to find as a matter of law that State Auto took a meritless position during the Missouri litigation, which caused the delay in Boardwalk's ability to rebuild. As already discussed, while it may be clear that the Missouri litigation caused Boardwalk an excusable delay in its reconstruction efforts, there has been no finding that State Auto took an unreasonable position, nor that it was vexatious. Moreover, any amount of consequential damages that may be awarded under the Policy is in genuine dispute. The parties offer different calculations and expert opinions and the jury will be called upon to determine the appropriate award of actual and consequential damages, if any, based on this evidence.

Boardwalk's motion is granted insofar as it seeks summary judgment that it may recover consequential damages in an amount of business income loss that exceeds the policy limits, if it is able to show causation of damages in an amount in excess of the policy limit.

### b. Prejudgment Interest

Boardwalk requests summary judgment on its entitlement to prejudgment interest under K.S.A. § 16-201. In Kansas, the general rule is that prejudgment interest is allowable on liquidated claims.[108] "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation."[109] Boardwalk claims that the business income loss was not in dispute. The Court disagrees and denies summary judgment on this issue. As illustrated by the sheer amount of issues the Court was called upon to resolve on the business income claim in this action, the amount of damages is hotly disputed. The parties dispute the restoration period, the method of calculation, and several specific items involved in the calculation. They each rely on different experts and witnesses in support of their calculation. Given the uncertainty of the damages amount in this case, the Court declines to find that Boardwalk is entitled to prejudgment interest under Kansas law on the basis that it is a liquidated claim; its motion is denied on this issue.[110]

---

[108]*Royal Coll. Shop, Inc.*, 895 F.2d at 673; *Fidelity & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.*, 215 F. Supp. 2d 1171, 1194 (D. Kan. 2002)

[109]*Kilner v. State Farm Mut. Auto. Ins. Co.*, 847 P.2d 1292, 1300 (Kan. 1993).

[110]The Court could also, in its discretion, award prejudgment interest under an equitable theory to make Boardwalk whole, even where the damages are unliquidated. *See Royal Coll. Shop, Inc.*, 895 F.2d at 675 (discussing *Schatz Dist. Co.v. Olivetti Corp.*, 647 P.2d 820, 827 (Kan. Ct. App. 1982)). Boardwalk does not explicitly make this request in its motion for summary judgment, and, even if it did, the Court finds that any determination as to whether such equitable relief is appropriate is premature at this time.

### C. Boardwalk's Alternative Tort Claims

Boardwalk's tort claims for misrepresentation and negligent claims handling are asserted "to the extent it is determined that Boardwalk somehow waived its right to replacement cost coverage of Building 1 by allegedly failing to timely rebuild."[111]  The Court granted Boardwalk's motion for summary judgment that it did not waive replacement cost coverage by timely rebuilding under the 2008 Stipulation.  Therefore, the Court finds that State Auto's motion for summary judgment on these two claims are moot.

### D. State Auto's Remaining Counterclaims and Defenses

### 1. Counterclaims

Boardwalk moves for summary judgment on State Auto's remaining counterclaims: Count I for breach of the Stipulation, Count II for unjust enrichment based on coinsurance, and Count V for unjust enrichment.  State Auto did not specifically address these counterclaims in its response.  State Auto's Counts I and II assert that it overpaid Boardwalk when it made the advance payments because Boardwalk failed to timely initiate replacement of Building 1 under the Stipulation, triggering an entitlement to the actual cash value of Building 1 only.  Because the Court grants Boardwalk's motion for summary judgment that it timely initiated reconstruction, the Court agrees that summary judgment should also be granted to Boardwalk on these counterclaims.

Counts II and V allege unjust enrichment based on Boardwalk's retention of State Auto's advance payments on the property damage and business income loss claims.  Boardwalk moves

---

[111]Pretrial Order, Doc. 170 at 28.

for summary judgment arguing that these claims are barred by the statute of limitations and because an express contract governs this dispute.

Quantum meruit, or unjust enrichment, "lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him."[112] Unjust enrichment creates, on the basis of equity and justice, a quasi-contract, which is used to enforce noncontractual duties. To succeed on a claim for quantum meruit, or unjust enrichment, a plaintiff must show, "(1) a benefit has been conferred upon the defendant, (2) the defendant retains the benefit, and (3) under the circumstances, the defendant's retention of the benefit is unjust."[113] "Kansas law is clear that quasi-contractual remedies, such as unjust enrichment, 'are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.'"[114] "Moreover, 'courts applying Kansas law have concluded that quantum meruit and restitution are not available theories of recovery when a valid, written contract addressing the issue exists.'"[115]

The Court agrees that State Auto's claims for unjust enrichment cannot proceed because an express contract governs the dispute about whether Boardwalk was overpaid when State Auto advanced payments to them prior to litigation commencing. State Auto's unjust enrichment theories are governed by the insurance contract and the Stipulation, and therefore summary

---

[112]*Peterson v. Midland Nat'l Bank*, 747 P.2d 159, 166 (Kan. 1987).

[113]*Estate of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 706 (Kan. 2009).

[114]*See Britvic Soft Drinks, Ltd. v. ACSIS Techs., Inc.*, No. 01-2243-CM, 2004 WL 1900584, at *2 (D. Kan. June 8, 2004) (citing *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 130 F.3d 950, 957 (10th Cir. 1997)).

[115]*Id.* (quoting *Fusion, Inc. v. Neb. Aluminum Castings, Inc.*, 934 F. Supp. 1270, 1275 (D. Kan. 1996)).

judgment is granted on those counterclaims.

## 2. Affirmative Defenses

Boardwalk moves for summary judgment on State Auto's first, third, fourth, ninth, tenth, and thirteenth affirmative defenses. State Auto responds to the motion only as to its third affirmative defense—that Boardwalk failed to cooperate as required by the Policy.

State Auto's third and fourth affirmative defenses are that Boardwalk failed to comply with the Policy provision to cooperate with State Auto's investigation of the business income claim. State Auto contends that Boardwalk failed to cooperate by providing inaccurate federal income tax returns with respect to the interest income earned on State Auto's indemnity payment. State Auto further contends that Boardwalk failed to complete, notarize, and return proof of loss forms within sixty days as required under the Policy. Boardwalk argues that because the fraud and misrepresentation claims have been dismissed, State Auto has no basis for this defense. The Court disagrees. This affirmative defense does not turn on intentional or negligent concealment, but instead on whether Boardwalk cooperated with State Auto's investigation under the terms of that provision in the Policy. The fact that State Auto's counterclaims that were premised on a different provision were dismissed does not dictate dismissal of this defense as well. In fact, there is a genuine issue of material fact, as already discussed in this Order, about the accuracy of the income tax returns. Whether certain Boardwalk transactions should have been reported on the income tax returns is also genuine issue of material fact. Viewing the evidence in the light most favorable to State Auto as the nonmoving party, a reasonable jury could determine that the federal income tax returns were inaccurate. It could also conclude that Boardwalk failed to cooperate by not providing State

Auto with the necessary documentation to correctly calculate the business income loss.

Boardwalk argues that State Auto should be barred from arguing that its failure to submit a proof of loss claim constitutes a failure to comply with all Policy provisions and to cooperate under the Policy because State Auto has never asserted this theory until summary judgment. The Court agrees. Boardwalk asked State Auto in its Second Set of Interrogatories to identify "each and every instance in which Boardwalk failed 'to cooperate with State Auto in the investigation or settlement of the claim," as alleged in this affirmative defense.[116] State Auto itemized five instances of failure to cooperate, none of which state that Boardwalk failed to submit proof of loss. Therefore, this theory was raised for the first time in the response to Boardwalk's summary judgment motion. While the Federal Rules contain liberal pleading standards, it does not "'permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case.'"[117] In this case, the prejudice to Boardwalk is substantial, because not only did it not have notice of this basis for State Auto's affirmative defense, State Auto affirmatively represented that its affirmative defense was based on other theories that it does not pursue in response to summary judgment. Summary judgment is granted to Boardwalk to the extent State Auto's third and fourth affirmative defenses are based on Boardwalk's failure to submit a proof of claim on the business income claim.

State Auto's first affirmative defense is for failure to state a claim for relief on Boardwalk's breach of insurance contract claims. The Court has determined that Boardwalk is entitled to summary judgment on several issues on both breach of contract claims and that there

---

[116] Doc. 215, Ex. 7 at No. 5.

[117] *Orr v. City of Albuquerque*, 417 F.3d 1144, 1153 (10th Cir. 2005).

are genuine issues of material facts on other issues.  Summary judgment is granted in favor of Boardwalk on State Auto's first affirmative defense.

The Court agrees with Boardwalk that summary judgment should be granted on State Auto's ninth and tenth affirmative defenses based on this Court's prior rulings.

Boardwalk's motion for summary judgment is moot with respect to State Auto's thirteenth affirmative defense that Boardwalk's business income claim is barred because it is based on "inaccurate estimates" of the loss.  This Court has determined that the amount of business income loss is a genuinely disputed material fact to be determined by the jury.

**IT IS THEREFORE ORDERED BY THE COURT** that the parties' motions for partial summary judgment(Docs. 211, 214) are each **GRANTED IN PART and DENIED IN PART** as set forth in this Memorandum and Order.

Dated: March 28, 2014

S/ Julie A. Robinson

JULIE A. ROBINSON

UNITED STATES DISTRICT JUDGE