## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| BOARDWALK APARTMENTS, L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-2714-JAR |
| | ) | |
| STATE AUTO PROPERTY AND | ) | |
| CASUALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

This insurance coverage action arose out of a 2005 fire at Boardwalk Apartments, L.C.'s ("Boardwalk") apartment complex in Lawrence, Kansas. Boardwalk was insured under a commercial property insurance policy issued by State Auto Property and Casualty Insurance Company ("State Auto"). The Policy's business income, replacement cost, and coinsurance provisions were at issue in this case, the second of two lawsuits filed to resolve coverage disputes after the fire. The Court ruled on several matters on cross-motions for summary judgment, narrowing the issues to be decided at trial. Beginning on June 24, 2014, this case was tried to a jury. The jury returned verdicts in favor of Boardwalk on both breach of contract claims, calculating damages for each claim and finding consequential damages in the amount of $2,627,943. Before the Court is State Auto's Motion to Alter or Amend Judgment Pursuant to Rule 59(e) and/or for Relief from Judgment Pursuant to Rule 60(b) (Doc. 358), which includes a request for remittitur. As described more fully below, the Court determines that the consequential damages award is excessive and conditions the denial of a new trial on the amount of consequential damages upon the acceptance by Boardwalk of a remittitur.

I.      **Background**

The Boardwalk apartment complex in Lawrence, Kansas, was located on Frontier Way, which used to be called Fireside Drive.  This dispute arises out of a fire that occurred on October 7, 2005 that destroyed Building 1 in the Boardwalk apartment complex.  On March 27, 2006, State Auto filed a lawsuit on certain coverage issues against Boardwalk in the Western District of Missouri ("the Missouri Litigation").  The Missouri Litigation concluded on September 8, 2009.  The Court determined on summary judgment that after the Missouri Litigation concluded, Boardwalk timely elected to rebuild Building 1.  Boardwalk contended at trial that State Auto breached the insurance contract because it failed to pay the full amounts owed under the policy. Boardwalk sought the cost to replace Building 1, which Boardwalk contended at trial was $3,408,957.  State Auto previously paid Boardwalk $2,128,794.17 as indemnity for Building 1, but Boardwalk contended in this lawsuit that State Auto owed it an additional amount for the replacement cost of Building 1.  State Auto argued that the coinsurance provision of the Policy applied, reducing its obligation to pay the full replacement cost, and therefore Boardwalk was not entitled to any additional amounts under the terms of the Policy.

Second, Boardwalk contended it was entitled under the insurance policy to its lost rental business income during the "period of restoration," as well as consequential damages as a result of State Auto's failure to pay what was owed to Boardwalk under the Policy.  State Auto asserted a counterclaim that Boardwalk is not entitled to any additional payments under the Policy because Boardwalk failed to cooperate with State Auto in the investigation or settlement of its claims.  State Auto further asserted that Boardwalk's actual business income losses are much lower than Boardwalk contended because Boardwalk should have replaced Building 1

more quickly than it did and because Boardwalk's business income claim must be reduced by the interest income Boardwalk earned on the prior indemnity payment during the time it took to replace Building 1.

In the Pretrial Order entered on July 24, 2013, Boardwalk sought consequential damages on both of its breach of contract claims, including "increased business income losses and increased costs of construction due to building laws and ordinances passed during the pendency of litigation."[1]  In the Damages section of the Pretrial Order, Boardwalk sought "consequential damages resulting from State Auto's delay in honoring its obligations under the Policy."[2]  Under the business income loss heading, the parties set forth subsections (a) for "Compromise Figures" and (b) "Boardwalk's Expert's Calculation."[3]  The compromise figures set forth in subsection (a) utilized Patrick Bello's adjusted numbers and claimed actual damages of $1,046,322.42. Boardwalk states on page 66: "State Auto is liable for the remainder of Boardwalk's business income losses above $949,200 ($97,122.42) because State Auto wrongfully sought to avoid liability by filing suit [in the Missouri Litigation], thereby delayed Boardwalk's ability to replace Building 1 and stem its rental income losses."[4]  The expert calculation in subsection (b) is based on Boardwalk damages expert Joseph Lesovitz's calculations, presented in the form of two scenarios.[5]  Scenario 1 claimed $1,412,607 in business income loss based on historical rents and a 69.5 month period of restoration, ending in July 2011.  Scenario 2 claimed $2,001,362 based

---

[1]Doc. 170 at 30.

[2]*Id.* at 65, ¶ 10.a.1.

[3]*Id.*

[4]*Id.*

[5]*Id.* at 66, ¶ 10.a.1.

on all business income loss resulting from the delay in payment, assuming a new building was constructed in 2006.

On the replacement cost claim, Boardwalk requested the full replacement cost to rebuild Building 1 with no coinsurance, as well as "Additional Costs of Construction Due to Laws and Ordinances Regulating Reconstruction of Building 1," to the extent that any limitation of coverage for these costs was deemed to be against Kansas public policy.[6]  Within this category of damages, Boardwalk "in addition" sought "recovery of maintenance and other costs it incurred in maintaining Fireside Drive, for which it had to assume responsibility due to City of Lawrence density requirements enacted in 2006, in order to replace the number of units destroyed in the October 2005 fire."[7]

In its March 28, 2014 Summary Judgment Order,[8] the Court ruled on several discrete issues in this case, including that the "compromise figures" by Bello did not bind State Auto. The Court also ruled that Boardwalk was entitled to consequential damages on the replacement cost claim in the amount of any business income loss that exceeded the business income policy limit of $1,099,200, assuming it can show the requisite evidence of causation at trial.  The Court ruled on the business income loss claim that actual interest earned by Boardwalk from the 2006 indemnity payment should offset its business income loss, and allowed both damages experts to revise their expert reports to align with the Court's ruling on that issue.

Boardwalk presented extensive evidence at trial about the business income losses on

---

[6]*Id.* at 66–67, ¶ 10.a.3.

[7]*Id.*

[8]Doc. 246.

Building 1. Bello and Lesovitz testified as to their lost business income calculations and Randall Wilson testified on behalf of State Auto, presenting alternate calculations. In addition, Ernie Fleischer, the managing member of Boardwalk, testified that he wanted to rebuild Building 1 as soon as possible after the fire because he knew that the longer Building 1, the largest building in the complex, was vacant, the harder it would be to rent out the remaining units in the complex.

Prior to the jury instruction conference, the Court proposed to submit the following interrogatory to the jury on consequential damages based on its understanding that Boardwalk's consequential damages claim was limited to business income loss on Building 1 that was in excess of the policy limit: "If the sum in answer to Question 1 [the replacement cost of Building 1] is greater than $2,128,794.17, did Boardwalk sustain "consequential damages" in the form of rental business income loss, as defined in Instruction [ ]?" Boardwalk moved to strike the language "in the form of rental business income loss, as defined in Instruction [ ]?" from this interrogatory, arguing that this was just one item of consequential damages sought by Boardwalk and supported by the evidence. Boardwalk pointed the Court to evidence that it was required to secure its own insurance valuation experts, Paul Werner and Joseph Lesovitz, and that it was required to acquire and maintain Fireside Drive as a result of code changes that occurred during the delayed insurance claim process.[9] State Auto objected, claiming that these were new items of damages not previously disclosed. The Court sustained Boardwalk's objection and struck the limiting language from the verdict form. The only jury instruction concerning consequential damages described the causation standard under Kansas law.[10]

---

[9]Trial Tr., Vol. 7, Doc. 370 at 1361–62.

[10]Doc. 338, Instruction No. 11; *see, e.g.*, *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.*, 895 F.2d 670, 678 (10th Cir. 1990).

At no point during the trial did Boardwalk request a specific amount of consequential damages, nor specify to the jury the categories of consequential damages it contended was supported by the evidence other than to reference ongoing maintenance of Fireside Drive.  In his closing argument, counsel for Boardwalk referenced the profitability of the complex as follows:

> We know from the charts after the fire that the entire complex went into a tailspin.  Do you remember I showed Mr. Wilson?  They were losing money every year after that fire, because Building 1 meant huge—it was huge in terms of profitability.  Boardwalk is not seeking to recover its losses in relation to the entire complex, even though there obviously were additional damages.  Not only did they lose the renters in Building 1, but it had to affect, adversely affect the other buildings.  As I said before, with a football field long building that's not there anymore, it obviously has an effect.  But we're not asking for that, even though we could.[11]

And again, when discussing the saved expenses methodology on the business income claim, counsel pointed to State Auto expert Randall Wilson's opinion that imputed "an even larger portion of savings" to Building 1 after the complex was demolished.  He stated, "[t]hat would only be appropriate if Boardwalk was seeking lost rental for the entire complex, which they're not."[12]

During deliberations, the jury presented three written question to the Court,[13] all of which concerned consequential damages.  First, the jury asked:  "May we award attorney & court costs as part of consequential damages?  If so, do we just put an amount & attorney & court costs, or do we need these figures."  The Court replied, after consultation with counsel, "No, you may not award attorney fees or court costs as part of consequential damages."

---

[11]Trial Tr., Vol. 7, Doc. 370 at 1413.

[12]*Id.* at 1414.

[13]Doc. 345.

6

Second, the jury asked: "If we conclude there are consequential damages do we include the difference between the Replacement value & the $2.1mm advance in this amount with other damages?" The Court replied, after consultation with counsel, "You must be guided by Instruction Number 11, as well as Instruction Number 1, which instructs you to consider all the instructions as a whole."

And third: "Will the jury be asked to provide explanation of our responses or to note the exhibits used to reach this decision?" The Court replied, after consultation with counsel, "No."

The jury returned a verdict in favor of Boardwalk on both breach of contract claims—for replacement cost coverage and for business income loss. The verdict included a finding that the replacement cost of Building 1 was $3,914,727.50, that the value of the complex was an amount that precluded application of the coinsurance provision, that Boardwalk sustained $2,627,943 in consequential damages, that the Period of Restoration ended on August 21, 2011, that business income loss totaled $1,188,837.40, and that Boardwalk actually earned $99,706 in interest on the prior indemnity payment. The jury also found that Boardwalk did not fail to cooperate with State Auto during the investigation of its claims.

Based on the verdict, and after adjusting the damages awards for prior payments and deductibles, the Court entered Judgment in favor of Boardwalk and against State Auto on July 10, 2014, in the following amounts: (1) $939,131.44 on the business income claim; (2) $1,785,933.33 on the replacement cost claim; and (3) $2,627,943.00 in consequential damages.

## II.   Discussion

The parties have filed extensive post trial briefs on several motions pending before the Court. State Auto challenges the consequential damages award in three of these motions:

Motion for New Trial Pursuant to Rule 59(a) (Doc. 356), the instant Motion to Alter or Amend Judgment Pursuant to Rule 59(e) and/or for Relief from Judgment Pursuant to Rule 60(b) (Doc. 358), and its Renewed Motion for Judgment as a Matter of Law (Doc. 360). The renewed motion for judgment as a matter of law challenges, *inter alia*, the sufficiency of the evidence to support the consequential damages award. The motion to alter or amend challenges the sufficiency of the evidence, as well as alleges unfair surprise because the Pretrial Order did not put State Auto on notice of the scope of consequential damages ultimately awarded at trial. State Auto requests remittitur in the alternative in its motion to alter or amend, and moves separately for a new trial arguing that the consequential damages award is clearly, decidedly, or overwhelmingly against the weight of the evidence.

The Court heard oral argument on this issue on November 18, 2014. Although the Court has considered the statements of counsel at oral argument in ruling on this motion, it will confine its analysis to the issues raised in the briefs, to which Boardwalk was allowed to respond. For example, at oral argument State Auto argued for the first time that consequential damages may not be awarded in an amount higher than the contract, and that Boardwalk could not recover consequential damages because of the doctrine of unclean hands. Neither argument is raised in the briefs and therefore the Court does not consider them.[14]

The Court first addresses State Auto's motion to alter or amend to based on unfair surprise and prejudice. The Court next considers the sufficiency of the evidence as to the consequential damages award, including State Auto's request for remittitur, which must be considered as an alternative to a new trial. This is because "in an ordinary remittitur case, the

---

[14]The Court notes for the record that the consequential damages award was *less than* the jury's award of actual damages on the replacement cost claim.

plaintiff must be offered a choice between a new trial and accepting a remittitur to avoid a serious problem under the Seventh Amendment, which reserves to the jury the determination of damages."[15]

## A.     Unfair Surprise and Prejudice

A motion to alter or amend judgment pursuant to Rule 59(e) may be granted only if the moving party can establish: (1) an intervening change in the controlling law; (2) the availability of new evidence that could not have been obtained previously through the exercise of due diligence; or (3) the need to correct clear error or prevent manifest injustice.[16]  Rule 60(b) provides that the Court may relieve a party from a final judgment for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.[17]

The Court agrees with Boardwalk that Rule 59(e) and 60 have a limited role in this post-trial analysis.  Both are inappropriate grounds to challenge the sufficiency of the evidence  on consequential damages, which instead must be considered in the context of Rule 50(b) or 59(a).[18]

---

[15] *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1447 (10th Cir. 1987).

[16] *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000); *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995).

[17] Fed. R. Civ. P. 60(b).

[18] *Elm Ridge Exploration Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013).

And to the extent State Auto asks the Court to alter or amend the judgment by reducing the consequential damages award, this is properly considered as a request for remittitur, which under certain circumstances may be granted as an alternative to a new trial under Rule 59(a).[19]

State Auto argues that the element of unfair surprise and prejudice here is based on the lack of notice in the Pretrial Order about the scope of consequential damages sought by Boardwalk.  According to State Auto, Boardwalk is limited by the Pretrial Order to claim at most $588,755 in consequential damages based on the difference between Lesovitz's alternative damages scenarios set forth in that document.

The Court disagrees with State Auto that the Pretrial Order limited the scope of consequential damages sought at trial by Boardwalk.  The Pretrial Order made clear that Boardwalk sought all consequential damages that flowed from the breach, or were within the reasonable contemplation of the parties as resulting from the breach, i.e. the delayed payment for replacing Building 1.  It made clear that Boardwalk sought additional business income losses in excess of the policy limit.  It also made clear that it was seeking consequential damages for the maintenance of Fireside Drive, which Boardwalk acquired due to changes in laws and ordinances passed during the delay in payment.  While increased law and ordinance costs were included in the replacement cost of Building 1, the costs to maintain the road were not, which is why these damages were sought "in addition to" the increased costs to comply with modern laws and ordinances passed in 2006 and 2008.

Moreover, the Pretrial Order, while controlling as to the parties' claims and defenses, did not square off the specific amount of consequential damages Boardwalk could claim at trial.  The

---

[19]*See O'Gilvie*, 821 F.2d at 1447.

Pretrial Order was entered in July 2013, before the Court's summary judgment ruling, and before the Court ruled on State Auto's *Daubert* motion with respect to Lesovitz. Based on those orders, the Court allowed both damages experts to amend their reports in order to address the Court's ruling on interest income, a ruling that was unaccounted for at the time the Pretrial Order was drafted. As long as Boardwalk was able to show that the consequential damages it sought at trial derived from the breach—i.e. the delayed payment— those damages were sufficiently pled in the Pretrial Order and should not have come as an unfair surprise to State Auto.

**B.**    **Sufficiency and Excessiveness of the Consequential Damages Award and Request for Remittitur**

State Auto challenges the consequential damages award as excessive and lacking an evidentiary basis and asks the Court to reduce the Judgment. This challenge is properly considered in the posture of a motion for remittitur.[20] In considering this argument, the Court must begin with the proposition that the jury's award is "inviolate" so long as "it is not so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial."[21] The Court should not order a new trial or remittitur when the amount of damages turns on weighing credibility of the witnesses, or resolving conflicting evidence.[22]

In a diversity case such as this one, state law governs whether an award of damages is

---

[20]*See, e.g.*, *O'Gilvie.*, 821 F.2d at 1447–48; *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.*, 895 F.2d 670, 678–79 (10th Cir. 1990); *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009).

[21]*Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1062 (10th Cir. 2013) (quotation marks and citations omitted).

[22]*Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994).

excessive or inadequate.[23]   Boardwalk was entitled to recover damages that "may fairly be considered as arising, in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach."[24] "[I]n order for evidence to be sufficient to warrant recovery of compensatory damages there must be some reasonable basis for computation which will enable a court or jury to arrive at an approximate estimate thereof."[25]   Contract damages do not have to be established with reasonable certainty, however, they "cannot be too conjectural and speculative to form a sound basis for measurement."[26]   The Kansas Supreme Court has explained the distinction between causation and damages evidence on breach of contract claims as follows:

> The measure of damages recoverable for a breach of contract is limited to such as may fairly be considered as arising in the usual course of things from the breach itself, or as may reasonably be assumed to have been within the contemplation of the parties as the probable result of such a breach.  The evidence allowed to support damages for breach of contract is the best evidence obtainable under the circumstances of the case to show the natural and ordinary consequences of the breach and which will enable the court or the jury to arrive at a reasonable estimate of the loss which resulted.[27]

Boardwalk contends that there was evidence of causation and damage on the following categories, sufficient to support the jury's consequential damages award: (1) consequential business income loss on Building 1; (2) fees to obtain valuation of insurance losses of

---

[23]*Id.* (citing *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1224, 1251 (10th Cir. 2000)).

[24]*Hochhman v. Am Family Ins. Co.*, 673 P.2d 1200, 1203 (Kan. Ct. App. 1984); *see also Earth Scientists (Petro Servs.) Ltd. v. U.S. Fid. & Guar. Co.*, 619 F. Supp. 1465, 1475 (D. Kan. 1985).

[25]*Denman v. Aspen Drilling Co.*, 520 P.2d 1303, 1307 (Kan. 1974).

[26]*Brown v. United Methodist Homes for the Aged*, 815 P.2d 72, 86 (Kan. 1991).

[27]*Phillips & Easton Supply Co. v. Eleanor Int'l, Inc.*, 512 P.2d 379, 386 (Kan. 1973) (citations omitted).

approximately $150,000 to Werner and Lesovitz; (3) architectural fees in the amount of $450,000 to Werner; (4) complex-wide rental income losses; (5) acquisition and maintenance of Fireside Drive as a result of code changes; and (5) interest and fees on a construction loan from Commerce Bank.

### 1.    Additional Business Income Loss on Building 1

State Auto urges that Boardwalk is only entitled to recover consequential damages in the form of business income lost after the period of restoration but before Building 1 was fully occupied.  State Auto extrapolates the jury's finding of a $16,799.24 loss figure for the thirty days after Building 1 was actually replaced,[28] and argues that for the nine-month period between August 2011 and May 2012, there could be no more than $151,193.16 in total consequential damages.  Boardwalk contended, and the jury agreed, that State Auto breached the Policy by failing to pay the full replacement cost of Building 1.  Boardwalk further argued that the delay in paying on the replacement cost claim increased its business income loss on Building 1 based on the changes in building codes that went into effect during the delay, and because a new building could have commanded higher rents and occupancy rates.  The request was not limited to the period after the Period of Restoration provided for under the business income loss policy provision.  While State Auto presents one approach to calculating consequential damages that is certainly permitted by the evidence, the Court's task on this motion is to determine whether the jury's award is supported by some reasonable basis for computation that allowed the jury to reach a reasonable estimate of the loss.  As Boardwalk points out, and as described below, the jury could have relied on Lesovitz's testimony to reasonably compute more than $151,194.16 in

---

[28]Doc. 341, Interrogatory 6.c.

consequential damages.

Lesovitz testified about his business income loss findings for Building 1 under two scenarios. Under Scenario 1, he quantified rental income loss of $1,462,902 for the period October 7, 2005 through August 2011, assuming the historic rents of the former Building 1, which he testified slightly increased from 2006 through 2011 based on information he reviewed about the Lawrence, Kansas, market.  In Scenario 2, Lesovitz quantified rental income loss of $2,051,656, assuming that a brand new building was built in the place of Building 1 in September 2006 that would have commanded higher rents and higher occupancy rates.  From October 2005 until October 2006, Scenario 2 relied on historic rental rates of former Building 1, and then starting in October 2006 through May 2012, relied on higher rent and occupancy rates.

State Auto argues that since Lesovitz's two scenario timelines overlap, then Boardwalk could only recover consequential damages under Scenario 2 for the additional amount of rent over the historic rental rate between October 2006 and May 2012.  State Auto argues that under this formula, Boardwalk's damages could be no more than $588,754, the difference between Scenario 1 and Scenario 2.  Boardwalk responds by arguing that instead, the jury could have simply subtracted its business income loss finding of $1,188,837.40, from Lesovitz's Scenario 2 (after a reduction for the partial payment) to reach a consequential damages figure.  After adjusting for interest earned and the prior payments, this would leave $962,514.56 as the amount of consequential rental income damages Boardwalk would have earned had it been able to rebuild by September 2006, given Lesovitz's Scenario 2 figures.  Lesovitz testified that his figures were based on conservative assumptions.

The Court agrees with Boardwalk, that the jury could have reasonably relied on

Lesovitz's testimony that Scenario 2 represented consequential damages in the form of business income on Building 1 that would have exceeded historical rents, and would support $962,514.56 of the consequential damages given the jury's actual damages finding.  It is clear from the verdict that the jury found actual business income losses somewhere between the figures used by Bello in 2006, and the figures used by Lesovitz in Scenario 1.  The jury was entitled to credit and adjust the numbers provided by Lesovitz in awarding consequential damages even if it did not rely on those numbers to award actual damages, and the Court need not "run the exact numbers and calculations of a damages model with mathematical certainty."[29]  The Court only must determine whether the award was within the range permitted by the evidence and whether there was some reasonable basis to compute the additional consequential damages associated with Building 1's business income losses.  Without weighing credibility or resolving evidentiary conflicts, the evidence presented by Lesovitz permitted a finding that an additional $962,514.56 in business income loss on Building 1 was caused by State Auto's failure to timely pay on the replacement cost claim.

## 2.    Insurance Valuation and Architectural Fees

State Auto concedes that there was evidence to support the insurance valuations and architectural fees to Werner and Lesovitz.[30]  Moreover, a reasonable jury could conclude that these fees were necessitated by the delay in valuing State Auto's business income claim,

---

[29]*In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1268 (10th Cir. 2014) (quotation omitted); *see also Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1019 (10th Cir. 2008) (affirming higher award than that testified to by expert where expert testified it was a conservative estimate).

[30]Indeed, this evidence was elicited by State Auto.  *See* Trial Tr. vol. 3, Doc. 366 at 773–74 (Werner testimony about approximately $400,000 to $500,000 in architectural fees and $50,000 in expert witness fees); Trial Tr. vol. 5, Doc. 368 at 927 (Lesovitz testimony about $100,000 expert witness fee).

requiring Boardwalk to obtain independent valuations out of pocket.  Based on evidence of increased fees to value the insurance claims and to adjust the architectural plan, along with the business income losses on Building 1, the Court finds that the jury could have awarded $1,562,514.56 in consequential damages.  Such evidence may be found in the record without assessing the credibility of witnesses, or resolving conflicting evidence.

### 3.    Loss of Complex-Wide Business Income

As to complex-wide rental income, State Auto argues that there was no evidence of causation to support such damages because Boardwalk's decision to demolish the other buildings was not proximately caused by the fire.  The Court finds that there was sufficient evidence of causation of complex-wide business income losses.  The cause of Boardwalk's consequential damages need not be the fire.  The cause must derive from the breach—State Auto's failure to pay the full replacement cost of Building 1.  Boardwalk argues that it suffered complex-wide business income loss because Building 1 was the largest building in the middle of the complex and its demolition made it more difficult to rent out the other apartments remaining in the complex.  Boardwalk points to Fleisher's testimony that he wanted to rebuild Building 1 as soon as possible in order to avoid the lost rental income that he believed would result from a vacant lot where the biggest building in the complex once stood.  And Lesovitz testified that while he did not quantify the complex-wide losses in either Scenario 1 or 2, those losses would have been much higher.  Most probative, however, are the profit and loss statements offered by State Auto and discussed during Wilson's testimony.  Those profit and loss statements show that each year after the fire, the complex profits dropped dramatically, and by 2009, the complex was operating at a loss. The Court agrees that based on this evidence, the jury could have concluded that State

Auto should have reasonably anticipated that delaying payment on the replacement cost claim would adversely affect Boardwalk's business income on the other buildings in the complex.

While the Court finds that the complex-wide losses associated with the delayed payment on Building 1 is a correct measure of consequential damages, the Court is unable to find that there was sufficient evidence that would provide the jury with a reasonable basis to compute such losses. Lesovitz testified about the complex's net profits in the context of describing his determinations of saved expenses for Building 1.[31] He testified that before the fire, the entire complex had a net profit of between $300,000 to $350,000 per year for all of the buildings, compared to Building 1, which had a net profit of about $200,000 per year. Boardwalk argues that since this estimate is about 1.75 times the Building 1 lost profits of $200,000 annually, the jury could have determined complex-wide rental income losses as high as $1.6 million by multiplying the actual damages of $939,141 by 1.75. But Lesovitz's testimony about complex-wide profits assumed the <u>total</u> loss of the entire complex: "if you destroy or demolish the entire complex, you're losing all $350,000 of profit. . . . I'm only quantifying the rental income losses for Building 1, which is about $200,000. So it doesn't include the rental income losses related to the other buildings."[32] Lesovitz explicitly denied calculating business income loss for the entire complex.[33] Similarly, the profit and loss statements for the years 2004 through 2010 show that the complex continued to lose profits after the fire at a high rate. By 2009, the complex was operating at a loss. However, there was no evidence to aid the jury in determining how much of

---

[31] *See, e.g.*, Trial Tr. Vol. 4, Doc. 367 at 889–95; Vol. 5, Doc. 368 at 961–62.

[32] Trial Tr. Vol. 5, Doc. 368 at 961–62.

[33] Trial Tr. Vol. 4, Doc. 367 at 894; Vol. 5, Doc. 368 at 961–62.

this loss, exclusive of Building 1, should be considered "business income loss" for the complex. Unlike Building 1, neither expert calculated losses to the complex.

There was no evidence presented at trial that the complex was entirely untenantable after the fire.  Nor was any evidence presented at trial about the degree to which the complex's occupancy rate, or rental rate decreased due to the missing Building 1.  Boardwalk essentially proposes a lost profits analysis on the complex, rather than a business income analysis, which would be dictated by the terms of the Policy.  Also, the Court disagrees with the degree of extrapolation by Boardwalk.  Its $1.6 million estimate would account for a double recovery as it is inclusive of the business income losses associated with Building 1.  Fully crediting Lesovitz's testimony on this point, the evidence only would have permitted the jury to reasonably infer that some portion of the $100,000–$150,000 remaining annual net profit on the complex was lost due to the delayed reconstruction of Building 1.  This remaining net profit is one-half to three-quarters of the loss attributable to Building 1.  Given that there was no evidence in the record about the degree to which the remaining buildings lost business income, it would be pure speculation for the jury to quantify non-Building 1 losses based solely on Lesovitz's testimony.  Moreover, the timeline for business income loss would not necessarily be the same as for Building 1 given the undisputed evidence that Boardwalk began to evacuate tenants in the other buildings in 2009 in order to demolish the other buildings.[34]  Therefore, the Court finds that it would not have been reasonable for the jury to conduct a rote extrapolation of the Building 1 business income loss, or pre-fire net profits, in order to reach a complex-wide business income loss amount.

---

[34]Trial Tr. Vol. 4, Doc. 367 at 893; Vol. 5, Doc. 368 at 961.

Likewise, while the jury could have considered Boardwalk's profit and loss statements, it was provided no guidance about how to attribute any lost profits to the delayed payment. Those statements showed Boardwalk's net profits decreased from around $288,568 in 2004 to a loss of $17,042 by 2009.[35] Again, while this evidence is probative that the loss of Building 1 caused complex-wide profits to decline, there is no evidence in the record to assist the jury in computing the loss attributable to the breach, rather than to Boardwalk's decision to proceed to replace the entire complex instead of just Building 1. And importantly, counsel for Boardwalk told the jury twice during his closing argument that Boardwalk was *not* seeking damages based on the complex's lost profits.[36] The Court is cognizant that under Kansas law, Boardwalk need not prove damages with absolute certainty, however, the Court is unable to find that the evidence was sufficient to permit even a reasonable approximation of complex-wide losses. Instead, such an approximation would have been based on speculation or conjecture.

### 4.     Fireside Drive

Boardwalk also sought consequential damages in the form of maintaining Fireside Drive as a result of code changes during the period of restoration. Again, the Court finds that there was certainly evidence presented at trial that increased costs of maintaining Fireside Drive flowed from the breach. Werner testified at length about the decision to acquire Fireside Drive and how it was necessitated by code changes that took effect in the summer of 2006, while the Missouri litigation was pending. But again, the Court finds that there was no evidentiary basis for the jury to reasonably approximate a measure of these damages. In fact, Fleischer testified that he

---

[35]Ex. 491a.

[36]Trial Tr., Vol. 7, Doc. 370 at 1413, 1414.

had tried to quantify these damages, but was unable to do so:

> Q.     Do you know—let me ask you to—when you say that Boardwalk has the responsibility to maintain the street, what does that mean?
>
> A.     Everything that the city had been doing before; cleaning the street, removing snow, filling potholes, oiling the street, re-paving the street. Everything that I had observed over my lifetime that I saw the city doing to make certain that the street in front of my house looked nice and cars wouldn't break their axles, passengers would have a smooth ride.
>
> Q.     Is this an ongoing obligation, ever-ending—never-ending obligation?
>
> A.     Never-ending, going on forever.
>
> Q.     Okay. And do you know what this is going to cost?
>
> A.     I do not. I have attempted unsuccessfully in getting somebody to tell me what the cost is forever.[37]

Boardwalk did not present evidence of its current costs to maintain Fireside Drive. Boardwalk did not present evidence as to whether it contracted with an outside entity to provide all of these services, or whether it maintained the road in whole or in part by using its own employees. Boardwalk did not present invoices or bids from contractors that might provide the jury with a method to calculate these damages. Boardwalk instead focuses on Instruction No. 21, where the jury was told that it could "draw reasonable inferences from the testimony and exhibits you feel are justified in the light of common experience."[38] While it is true that the jurors were entitled to draw on common experience in weighing the evidence, when considering consequential economic damages on a contract claim, they were required to have some evidentiary basis for reaching their award.[39] And even assuming that they could draw on their common experience in determining the costs associated with maintaining a road in Lawrence,

---

[37]Doc. 371, at 22.

[38]Doc. 338, Instruction No. 21.

[39]*See, e.g.*, *Denman v. Aspen Drilling Co.*, 520 P.2d 1303, 1307 (Kan. 1974).

Kansas, the Court cannot find that common sense or experience would support an award of approximately $1 million in street maintenance costs, the shortfall necessary to reach the jury's total consequential damages award.

5.      **Commerce Bank Loan**

Likewise, as Boardwalk admits, there was no evidence in the record about the loan amount, fees, or interest associated with the Commerce Bank loan Boardwalk was required to obtain in order to finish the complex replacement without the full insurance payment.  The jury could not have relied on such costs as contributing to the compensatory damages associated with the breach.

III.    **Conclusion**

"When a court concludes that there was error only in the excessive damage award, but not error tainting the finding of liability, it may order a remittitur or grant a new trial if the plaintiff refuses to accept the remittitur."[40]  It is clear to the Court that the jury attempted to follow the instructions in this case, despite very limited guidance from the parties regarding the consequential damages claim.  Boardwalk did not request an amount of consequential damages, nor did the instructions provide any guidance to the jury about the types of consequential damages sought.  During closing argument, Boardwalk mentioned its consequential damages claim with regard to Fireside Drive and explicitly told the jury it was not claiming damages for complex-wide losses.  The only instruction proposed by the parties and provided to the  jury was on the applicable causation standard.  It appears from the written jury questions during deliberations that the jurors struggled with how to compute the consequential damages in this

---

[40]*Klein v. Grynberg*, 44 F.3d 1497, 1504 (10th Cir. 1995).

21

case.

Unfortunately, while not the product of bias, passion, or prejudice, the award was excessive because it was not entirely supported by the evidence. The Court notes that the consequential damages claims in this case were economic, so they were capable of reasonable approximation in a manner not necessarily available in cases where the consequential damages are mainly non-economic.[41] Given the standard that applies under Kansas law for the quantum of proof necessary to support contract damages, the Court is unable to find an evidentiary basis for certain categories of damages claimed by Boardwalk in its post-trial briefs. Accordingly, the Court finds that State Auto's request for remittitur should be granted to the extent the damages award exceeds the amounts supported by the trial evidence on the Building 1 consequential business income losses, and the insurance valuation and architectural fees that were incurred as a result of the delayed insurance payment. The Court finds that the jury's damages award therefore should be reduced to $1,562,514.56.

As outlined above, while the Court finds that the jury's verdict on consequential damages was excessive under Kansas law, it is satisfied that the verdict on liability and actual damages is sound and based on the jury's careful consideration of the evidence and instructions in this case. As described in the Court's order on the renewed motion for judgment as a matter of law, and motion for new trial, the jury's determinations are consistent with the evidence when viewed in

---

[41]*See, e.g.*, *Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1062 (10th Cir. 2013) (declining to grant remittitur on loss of consortium claim); *United Int'l Holdings v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1229–30 (10th Cir. 2000) (declining to grant remittitur on compensatory damages claim where witness testimony established amount of damages); *Palmer v. City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994) (declining remittitur where jury awarded an amount of damages less than requested by the plaintiff and calculated by the expert); *Griffith v. Mt. Carmel Med. Ctr.*, 842 F. Supp. 1359, 1371–72 (D. Kan. 1994) (granting remittitur as to non-economic damages where the jury's determination was contrary to the evidence).

the light most favorable to Boardwalk.

The Court may not simply amend the judgment to reflect this reduced award.  Under federal law, which governs the Court's procedure in this case, Boardwalk must be offered the choice between a new trial and accepting the remittitur, in order to avoid problems under the Seventh Amendment to the United States Constitution.[42]  If Boardwalk chooses to accept remittitur of the consequential damages award to  $1,562,514.56, they shall file a written notice to that effect on or before January 28, 2015.  If Boardwalk does not accept the remittitur, State Auto shall be entitled to a new trial on the issue of Boardwalk's consequential damages.

**IT IS THEREFORE ORDERED BY THE COURT** that State Auto's Motion to Alter or Amend Judgment Pursuant to Rule 59(e) and/or for Relief from Judgment Pursuant to Rule 60(b) (Doc. 358) is **granted in part and denied in part**.

If Boardwalk chooses to accept remittitur of the damages awarded on its claim for breach of contract to $1,562,514.56, it shall file a written notice to that effect on or before January 28, 2015.  If Boardwalk does not accept the remittitur, State Auto shall be entitled to a new trial on the issue of Boardwalk's consequential damages for breach of contract.

Dated: January 14, 2015

 S/ Julie A. Robinson        
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[42]*O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1447–48 (10thCir. 1987); *see also In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2009 WL 435111, at *11 (D. Kan. Feb. 20, 2009), *aff'd*, 619 F.3d 1188 (10th Cir. 2010).